UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
===========================================X
JOSEPH MARINO,

                          Plaintiff,

    -against-

BROOKHAVEN SCIENCE ASSOCIATES, L.L.C.,
ASSOCIATED UNIVERSITIES, INC., ZEP, INC.,
and DOW CHEMICAL CO.,

                         Defendants.
===========================================X

**AMENDED
COMPLAINT**

Docket No.:
2:19-cv-04839-FB-RML

Plaintiff JOSEPH MARINO, by his attorneys JOSEPH LANNI and THE JACOB D. FUCHSBERG LAW FIRM, L.L.P., as and for his Verified Complaint, complaining of the defendants, respectfully alleges, upon information and belief, as follows:

## PARTIES

1. At all times subsequently referenced, plaintiff JOSEPH MARINO was and is a resident of the County of Suffolk and the State of New York.

2. At all times subsequently referenced, plaintiff JOSEPH MARINO[1] resides at 60 Kunigunda Place Islip Terrace, NY 11752.

---

[1] JOSEPH MARINO is variously referred to as MR. MARINO and MARINO throughout this Complaint.

1

3.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company organized and existing under the laws of the State of Delaware.

4.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C.,[2] was and is a foreign limited liability company with its principal place of business situated in the State of New York at 40 Brookhaven Avenue, Building 460, P.O. Box 5000, Upton, New York 11973-5000.

5.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company duly registered and authorized to conduct business in the State of New York.

6.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that conducted business operations in the State of New York.

7.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that transacted business within the State of New York.

---

[2] BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., is variously referred to as BSA throughout this Complaint.

8.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that derived substantial revenue from conducting business operations, activities and transactions in the State of New York.

9.  At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that derived substantial revenue from goods used or consumed and/or services rendered in the State of New York.

10. At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that expected or should reasonably have expected that its acts, omissions and conduct had consequences in the State of New York.

11. At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that derived substantial revenue from interstate or international commerce in the regular course of its business operations, activities and transactions within the State of New York.

12. At all times subsequently referenced, the partners or constituent members of defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., were and are Battelle Memorial Institute (a/k/a "Battelle", a purported private not-for-profit corporation with its principal place of business situated at 505 King Ave., Columbus, OH 43201) and Stony Brook

University (an educational institution with its principal place of business situated at 100

Nicolls Road, Stony Brook, NY 89 Washington Ave., Room 110 EB, Albany, NY 11794).

13. At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that is a research management company that operates, manages, directs, controls and supervises facilities, including research laboratories, for the scientific research community.

14. At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is a foreign limited liability company that is a research management company that operates, manages, directs, controls and supervises facilities, including research laboratories, for the U.S. Department of Energy.

15. At all times subsequently referenced, defendant BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., was and is the operating contractor that operated, managed, directed, controlled and supervised a facility for the U.S. Department of Energy known as Brookhaven National Laboratory[3] located in Upton, NY, during the approximate period 1998 – present.

16. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and still is a purported domestic not-for-profit corporation organized and existing under the laws of the State of New York.

---

[3] Brookhaven National Laboratory is variously referred to as BNL throughout this Complaint.

17. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and still is a purported domestic not-for-profit corporation with its principal place of business situated in the District of Columbia at 1400 16th Street NW, Washington, DC 20036-2252.

18. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC.,[4] was and still is a purported domestic not-for-profit corporation created by a charter issued by the Board of Regents of the State University of New York, Department of Education, State of New York.

19. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that conducted business operations in the State of New York.

20. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and

21. is a domestic not-for-profit corporation that transacted business within the State of New York.

22. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that derived substantial revenue from conducting business operations, activities and transactions in the State of New York.

---

[4]ASSOCIATED UNIVERSITIES, INC., is variously referred to as AUI throughout this Complaint.

23. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that derived substantial revenue from goods used or consumed and/or services rendered in the State of New York.

24. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that expected or should reasonably have expected that its acts, omissions and conduct had consequences in the State of New York.

25. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that derived substantial revenue from interstate or international commerce in the regular course of its business operations, activities and transactions within the State of New York.

26. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that is a research management company that operates, manages, directs, controls and supervises facilities, including research laboratories, for the scientific research community.

27. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is a domestic not-for-profit corporation that is a research management company that operates, manages, directs, controls and supervises facilities, including research laboratories, for the U.S. Department of Energy.

28. At all times subsequently referenced, defendant ASSOCIATED UNIVERSITIES, INC., was and is the operating contractor that operated, managed, directed, controlled and supervised a facility for the U.S. Department of Energy known as Brookhaven National Laboratory located in Upton, NY, during the approximate period 1948 – 1997.

29. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation organized and existing under the laws of the State of Delaware.

30. At all times subsequently referenced, defendant ZEP, INC.,[5] was and is a business corporation with its principal place of business situated in the State of Georgia at 3330 Cumberland Blvd., Ste. 700, Atlanta, GA 30339.

31. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that conducted business operations in the State of New York.

32. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that transacted business within the State of New York.

33. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that derived substantial revenue from conducting business operations, activities and transactions in the State of New York.

---

[5] ZEP, INC., is variously referred to as ZEP throughout this Complaint.

34. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that derived substantial revenue from goods used or consumed and/or services rendered in the State of New York.

35. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that expected or should reasonably have expected that its acts, omissions and conduct had consequences in the State of New York.

36. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that derived substantial revenue from interstate or international commerce in the regular course of its business operations, activities and transactions within the State of New York.

37. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that was and is the manufacturer, marketer, distributor, and seller of industrial and commercial cleaning solvents primarily containing a toxic chemical known as trichloroethylene (i.e., "TCE") as an active ingredient.

38. At all times subsequently referenced, defendant ZEP, INC., was and is a business corporation that manufactured, marketed, distributed, and sold industrial and commercial cleaning solvents containing trichloroethylene (i.e., "TCE") to defendants BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., and ASSOCIATED UNIVERSITIES, INC., as the operating contractors of Brookhaven National Laboratory located in Upton, NY, during the approximate period 1948 – present.

39. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation organized and existing under the laws of the State of Delaware.

40. At all times subsequently referenced, defendant DOW CHEMICAL CO.[6] was and is a business corporation with its principal place of business situated in the State of Michigan at 2211 H. H. Dow Way, Midland, MI 48674

41. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that conducted business operations in the State of New York.

42. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that transacted business within the State of New York.

43. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that derived substantial revenue from conducting business operations, activities and transactions in the State of New York.

44. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that derived substantial revenue from goods used or consumed and/or services rendered in the State of New York.

---

[6]DOW CHEMICAL CO., is variously referred to as DOW throughout this Complaint.

45. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that expected or should reasonably have expected that its acts, omissions and conduct had consequences in the State of New York.

46. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that derived substantial revenue from interstate or international commerce in the regular course of its business operations, activities and transactions within the State of New York.

47. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that was and is the manufacturer, marketer, distributor, and seller of industrial and commercial cleaning solvents primarily containing a toxic chemical known as trichloroethylene (i.e., "TCE") as an active ingredient.

48. At all times subsequently referenced, defendant DOW CHEMICAL CO. was and is a business corporation that manufactured, marketed, distributed, and sold industrial and commercial cleaning solvents containing trichloroethylene (i.e., "TCE") to defendants BROOKHAVEN SCIENCE ASSOCIATES, L.L.C., and ASSOCIATED UNIVERSITIES, INC., as the operating contractors of Brookhaven National Laboratory located in Upton, NY, during the approximate period 1948 – present.

## JURISDICTION

49. That the jurisdiction of this Court is premised upon the defendants' transaction of business in the State of New York, defendants' substantial business operations in the State of New York, defendants' derivation of substantial revenue from business transactions, operations and activity in the State of New York, one defendant's principal place of business in the State of New York, one defendant's principal place of business in the State of New York, and the transactions, acts, omissions, conduct and occurrences by the defendants that form, in pertinent part, the factual basis of the causes of action in plaintiff's Complaint that occurred in the State of New York.

## VENUE

50. That the venue of this action is premised upon the defendants' transaction of business in the County of Suffolk, defendants' substantial business operations in the County of Suffolk, defendants' substantial derivation of revenue from business transactions, operations and activity in the County of Suffolk, the transactions, acts, omissions, conduct and occurrences by the defendants that form, in pertinent part, the basis of the causes of action in plaintiff's Complaint that occurred in the County of Suffolk, and the plaintiff's residence in the County of Suffolk.

## JURY DEMAND

51. That plaintiffs demand trial by jury of all issues presented in this action that are triable by a jury as of right pursuant to Fed. R. Civ. P. 38 and any other applicable statutes, regulations and rules.

## INTRODUCTION

52. JOSEPH MARINO, now 60 years old, worked at Brookhaven National Laboratory as a computer technician repairing, reconfiguring and servicing computers and supercomputers throughout the site. MR. MARINO was the employee of Carlyle Technical Services, L.L.C., and Entex, Inc. MARINO provided computer technology services to the BNL "operating contractor" at the time. MARINO used TCE[7] cleaning solvents on a daily basis in the course of his work duties pursuant to the directions of BSA managers. MARINO developed clear cell renal carcinoma in the right kidney, chronic kidney disease (stage III) in the left kidney, and other consequent medical problems as a result of his toxic exposures to TCE and other toxic substances at BNL. MARINO only used TCE solvents at BNL during his career as a computer technician.

53. TCE is classified and scientifically established as a "known human carcinogen" and a toxic substance hazardous to human health by agencies of the U.S. government, International Association for Research on Cancer, and a broad consensus of knowledgeable experts in the fields of science and medicine.

54. AUI and BSA ordered, purchased, delivered stored, and used vast quantities of TCE products at BNL. The TCE was delivered to BNL in aerosol spray cans, spray bottles, bottled liquid, drum / barrel and liquid bulk form. The vast majority of TCE products at BNL were

---

[7] TCE is the abbreviation for trichloroethylene and is the primary active ingredient in the cleaning solvents used by MR. MARINO at BNL used and/or sold by the defendants at BNL. Trichlorethylene and TCE are variously used interchangeably throughout this Complaint. The specific TCE products used by MARINO at BNL are identified in this Complaint. DOW and ZEP supplied the vast majority of the TCE cleaning solvents used at BNL during the period 1947 – 2006.

manufactured, distributed, sold and placed into the stream of commerce by DOW and ZEP. AUI and BSA negligently supplied, directed, and instructed MR. MARINO and many other workers to use TCE solvents during the course of their work duties at BNL. AUI and BSA negligently failed to provide protective measures to prevent MARINO and many other workers from the ultra-hazardous, hazardous and dangerous risks of TCE exposure through personal use. AUI and BSA negligently failed to provide proper and adequate safety instructions on the uses of TCE to MARINO and many other workers to prevent, avoid or limit the ultra-hazardous, hazardous and dangerous risks of TCE exposure through personal use. AUI and BSA negligently failed to provide proper and adequate warnings about the ultra-hazardous, hazardous and dangerous risks of TCE exposure, including its classification as a known carcinogen and/or toxic chemical, to MARINO and many other workers at the site.

55. AUI and BSA negligently stored, used, handled, discharged, released, discarded and disposed of TCE solvents and other toxic substances resulting in the pervasive environmental pollution and toxic contamination of buildings, structures, facilities, soils, surface waters, groundwater, ambient indoor air and drinking water supplies throughout the BNL site thereby subjecting MARINO and many other workers to the dangerous risks of TCE exposure.

56. AUI and BSA fraudulently concealed from MARINO and many other workers that BNL was dangerously polluted and contaminated with TCE – and other toxic substances – in the buildings, structures, facilities, soils, surface waters, groundwater, ambient indoor air and drinking water supplies presenting serious risks of harm, injury, illness and death to people

on the site. AUI and BSA fraudulently concealed from MARINO and many other workers for years after the termination of their work at the site that the TCE and toxic chemical pollution and contamination at BNL presented serious risks to their health from exposure through inhalational, trans-dermal, ingestional, and vapor intrusive routes.

57. ZEP and DOW manufactured, marketed, distributed, sold and placed into the stream of commerce the TCE solvents purchased and used by AUI and BSA at BNL that was supplied to MR. MARINO and other workers. ZEP and DOW negligently placed into the stream of commerce the TCE solvent products that were not reasonably safe for intended and foreseeable uses. ZEP and DOW negligently failed to provide proper and adequate safety instructions on the uses of TCE to MARINO and other workers. ZEP and DOW negligently failed to provide proper and adequate warnings about the dangerous risks of TCE exposure to MARINO and other workers.

58. MR. MARINO's TCE exposure at BNL caused, contributed to and was a substantial factor resulting in right renal clear cell carcinoma, left chronic kidney disease (stage III), and consequent injuries, illnesses, harm, losses and damages. MR. MARINO's exposure at BNL to other toxic substances contributed to and was a substantial factor resulting in right renal clear cell carcinoma, left chronic kidney disease (stage III), and consequent injuries, illnesses, harm, losses and damages.

59. The negligence of BSA, AUI, ZEP and DOW caused, contributed to and were substantial factors resulting in MR. MARINO's right renal clear cell carcinoma, left chronic kidney disease (stage III), and consequent injuries, illnesses, harm, losses and damages.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Disastrous Pollution, Contamination & Exposures at Brookhaven National Laboratory to Hazards, Dangers & Risks to Human Health

60. The events, actions, conduct, activities, omissions, transactions, occurrences, incidents and circumstances at issue in this matter include, but are not limited to, the following facts:

### Brookhaven National Laboratory

61. Brookhaven National Laboratory (BNL) occupies an approximately 5,300-acre site in Upton, NY, in Suffolk County on Long Island.

62. BNL is an atomic, nuclear and high-energy physics, chemical and biologic research facility with numerous buildings, structures and scientific facilities including three nuclear reactors[8], Relativistic Heavy Ion Collider, Alternating Gradient Synchotron, National Synchotron Light Source II, Accelerator Test Facility, Tandem de Graaff Electrostatic Accelerator, Space Radiation Laboratory and computational science supercomputer research laboratories.

63. BNL has existed since 1947.

---

[8] The Brookhaven Graphite Research Reactor and High Flux Beam Reactor were decommissioned and not operational during the period of time that the plaintiff worked at Brookhaven National Laboratory

64. BNL is owned by the U.S. Department of Energy (USDOE).

65. USDOE has provided for the operation of BNL by annual "operating contract" with a private "operating contractor" since 1947.

66. By the 1990's, the "operating contract" paid the "operating contractor" hundreds of millions of taxpayer dollars to operate BNL.

67. The annual "operating contract" was lucrative to whoever was the "operating contractor".

68. The "operating contractor" for BNL during the period 1947 – 1998 was ASSOCIATED UNIVERSITIES, INC. (AUI).

69. The "operating contractor" for BNL during the period 1998 – present is BROOKHAVEN SCIENCE ASSOCIATES, L.L.C. (BSA).

70. AUI and BSA collected billions of taxpayer dollars in revenue as the "operating contractor" for BNL.

71. USDOE terminated the "operating contract" with AUI in 1998 for the latter's breach and gross neglect of its duties and responsibilities to properly operate BNL under the contract.

72. USDOE entered into an "operating contract" with BSA in 1998 to operate BNL; however,

BSA did not adhere to the contract and agreement at least to 2006 if not later.

### The BNL "Operating Contractors'" Duties & Responsibilities
### for the Environment, Safety and Health at the Site

73. Pursuant to the "operating contract", the "operating contractor" for BNL was responsible to operate, control, manage, supervise, direct, administer, oversee and conduct all research, work, operations, activities, performance, services and functions at the laboratory and on the site.

74. The responsibilities of the BNL "operating contractor" included but were not limited to: (1) prevention, protection and conservation of the surrounding environment and environmental resources at the laboratory and on the site; (2) formulation, development, issuance, and implementation of safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) protection of the health, safety and welfare of employees, contractors, visitors and the general public against the hazards, dangers, risks, and effects presented by environmental pollution, toxic contamination, toxic substances, and dangerous, hazardous, and ultra-hazardous activities at the laboratory and on the site.

75. The responsibilities of the BNL "operating contractor" amounted to duties to use reasonable care to operate, control, manage, supervise, direct, administer, oversee and conduct all

research, work, operations, activities, performance, services and functions at the laboratory and on the site.

76. The responsibilities of the BNL "operating contractor" amounted to duties to use reasonable care to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and on the site; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) protect the health, safety and welfare of employees, contractors, visitors and the general public against the hazards, dangers, risks, and effects presented by environmental pollution, toxic contamination, toxic substances, and dangerous, hazardous, and ultra-hazardous activities at the laboratory and on the site.

### "Science Over Safety": BNL's Legacy of Toxic Chemical & Radiological Contamination:

77. During the course of its existence since 1947, the BNL "operating contractors", AUI and BSA, engaged in research, work, operations, activities, performance, services and functions at the laboratory and on the site that involved the extensive use, handling, production, discharge, release and disposal of radioactive fuels, substances, materials, and isotopes known to be hazardous and ultra-hazardous to human health, safety and welfare.

78. During the course of its existence since 1947, the BNL "operating contractors", AUI and BSA, engaged in research, work, operations, activities, performance, services and functions at the laboratory and on the site that involved the extensive use, handling, production, discharge, release and disposal of toxic chemicals known to be hazardous and ultra-hazardous to human health, safety and welfare.

79. During the course of its existence since 1947, the BNL "operating contractors", AUI and BSA, negligently used, handled, produced, discharged, released and disposed of radioactive fuels, substances, materials, and isotopes and thereby caused, created and contributed to (1) severe and pervasive pollution and contamination of the surrounding environment and environmental resources at the laboratory and on the site; (2) gross violations of safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards; (3) gross non-compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) hazards, dangers, and risks to the health, safety and welfare of employees, contractors, visitors and the general public at the laboratory and on the site sufficient to cause, contribute to and substantially result in injury, illness and death.

80. Some of those radioactive fuels, substances, materials, and isotopes that were used or produced at BNL were released, discharged, discarded and disposed at the site in such a manner as to constitute dosages sufficient to be known human carcinogens.

81. During the course of its existence since 1947, the BNL "operating contractors", AUI and BSA, negligently used, handled, produced, discharged, released and disposed of toxic chemicals and thereby caused, created and contributed to (1) severe and pervasive pollution and contamination of the surrounding environment and environmental resources at the laboratory and on the site; (2) gross violations of safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards; (3) gross non-compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) hazards, dangers, and risks to the health, safety and welfare of employees, contractors, visitors and the general public at the laboratory and on the site sufficient to cause, contribute to and substantially result in injury, illness and death..

82. Some of those toxic chemicals used or produced at BNL were and are known human carcinogens.

83. Some of those toxic chemicals used or produced at BNL were and are known to be highly toxic, poisonous and hazardous to human health, safety and welfare.

84. Some of those toxic chemicals used or produced at BNL were used, released, discharged, discarded and disposed at the site in such a manner as to constitute concentrations sufficient

to be carcinogenic, toxic, poisonous, hazardous, injurious and disease etiologic to human health, safety and welfare.

85. It is well settled that, throughout its existence since 1947, BNL presented and still presents an environmental pollution and toxic contamination health hazard to the people who were and are the employees, contractors and visitors on the site and the people who are the neighbors of the site.

86. In 1989, the U.S. Environmental Protection Agency (USEPA) declared BNL a Superfund Site due to the severe and pervasive environmental pollution and toxic contamination at the laboratory and on the site.

87. During the period 1989 – present, it was known by BNL's operating contractor that the severe and pervasive environmental pollution and toxic contamination on the site resulted from the unsafe practices related to the use, handling, production, discharge, release, discard and disposal of toxic chemicals, radiological fuels, byproducts, wastes and substances, and radioactive isotopes.

88. According to a former AUI BNL senior manager and physics department chairman who authored an article in a peer reviewed physics scientific journal, the "contamination events" were "mostly chemical" and, to a lesser degree, "radioactive[e]".

89. The former AUI BNL senior manager and physics department chairman also stated in the

21

article the following:

90. The "issue of safety was largely the responsibility of the contractor running the lab's operation".

91. "AUI was responsible for identifying issues that needed addressing".

92. "Most lab employees probably had little knowledge of the extent of the legacy environmental issues at BNL."

93. "Widespread 1992 investigation of suspected legacy contamination included a search through historical records and discussions with older employees to discover other unsuspected issues. The large site had changed its look over the years as army barracks were replaced with new buildings, so old records and memories of employees were crucial in trying to find other potential legacy problems. Some of those practices included disposal in an on-site landfill, an old sewage treatment plant that discharged into the headwaters of the Peconic River, leaks from underground pipes, and releases of cleaning agents into the ground. The cleanup of the contamination was to be concluded by 2006, although there were likely some unknowns yet to be addressed."

94. In 1997, there was "an internal BNL report by an ad-hoc committee, headed by Robert Bari, [that] evaluated BNL decision-making on environment, safety, and health (ESH) matters and recommended changes. They suggested that ESH budgets needed to be stabilized and that

ESH matters needed to be raised in overall priority and include broader input to decisions on resources."

95. Despite the internal AUI BNL report in 1997 by the ad-hoc committee on "environment, safety, and health" issues, ESH continued to be neglected and was not properly addressed by AUI and BSA to sufficiently eliminate the hazards, dangers and risks of environmental pollution and toxic contamination presented by the research, work, operations, activities, performance, services and functions at the laboratory and on the site.

96. The BNL "operating contractors", AUI and BSA, violated their respective duties to use reasonable care in the operation, control, management, supervision, direction, administration, overseeing and conduct of the research, work, operations, activities, performance, services and functions at the laboratory and on the site during the period 1997 – present.

97. The BNL "operating contractors", AUI and BSA, violated their respective duties to use reasonable care to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and on the site; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) protect the health, safety and welfare of employees,

contractors, visitors and the general public against the hazards, dangers, risks, and effects presented by environmental pollution, toxic contamination, toxic substances, and dangerous, hazardous, and ultra-hazardous activities at the laboratory and on the site during the period 1997 – present.

98. During the period 1947 – present, the BNL "operating contractors", AUI and BSA, engaged in research, work, operations, activities, performance, services and functions at the laboratory and on the site that involved the extensive use, handling, production, exposure, discharge, release, discard, and disposal of certain toxic chemicals and substances that were and/or are known to present severe hazards, dangers and risks to human health, safety and welfare, and serious injury, illness and death, including known human carcinogens.

99. Among the many toxic chemicals and substances known to be hazardous and ultra-hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site was trichloroethylene (TCE).

100. Among the many toxic chemicals and substances known to be hazardous and ultra-hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site was tetrachloroethylene (PCE).

101. Among the many toxic chemicals and substances known to be hazardous and ultra-

hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site were volatile organic compounds (VOC).

102.    Among the many toxic chemicals and substances known to be hazardous and ultra-hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site were toxic volatile organic compounds (TVOC).

103.    Among the many toxic chemicals and substances known to be hazardous and ultra-hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site were toxic heavy metals such as cadmium, chromium, cobalt, copper, lead and other similar substances.

104.    Among the many toxic chemicals and substances known to be hazardous and ultra-hazardous to human health, safety and welfare that were used at BNL by AUI and BSA in the course of its research, work, operations, activities, performance, services and functions at the laboratory and on the site was the toxic chemical benzene and other similar substances.

105.    Despite knowledge of the hazards, dangers and risks to human health, safety and welfare, the BNL "operating contractors", AUI and BSA, continued to violate their respective duties to use TCE, PCE, toxic heavy metals, benzenes and other toxic chemicals and substances

with reasonable care in the operation, control, management, supervision, direction, administration, overseeing and conduct of the research, work, operations, activities, performance, services and functions at the laboratory and on the site during the period 1997 – present.

106.    Despite knowledge of the hazards, dangers and risks to human health, safety and welfare, the BNL "operating contractors", AUI and BSA, continued to negligently breach, violate and fail to adhere to their respective duties to use TCE, PCE, toxic heavy metals, benzenes and other toxic chemicals and substances with reasonable care in order to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and on the site from contamination by these toxic chemicals and substances; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare hazards from contamination by these toxic chemicals and substances; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and health, safety and welfare hazards; and (4) protect the health, safety and welfare of employees, contractors, visitors and the general public against the hazards, dangers, risks, and effects presented by environmental pollution, toxic contamination, toxic substances, and dangerous, hazardous, and ultra-hazardous activities at the laboratory and on the site during the period 1997 – present.

107.    By the 1990's, BNL employees, contractors and subcontractors were well acquainted

with a saying that became the laboratory's unofficial motto: "Science over safety".

## BNL's VOC & TVOC Use, Contamination & Exposure Sources

108.    VOCs and TVOCs were extensively used at BNL by AUI and BSA during the period 1947 – 2006 if not later, in pertinent part, as solvents, degreasers, cleaning agents and disinfecting agents despite their known toxicity to humans.

109.    VOCs and TVOCs were extensively used at BNL by AUI and BSA during the period 1947 – 2006 if not later in many different activities including, but not limited to, the following: machining; metalworking; metal fabricating; milling; supercomputer operations; computer network maintenance, repair and reconfiguration; electrical equipment maintenance and repair; telephone and telecommunications maintenance and repair; information technology equipment maintenance and repair; construction; electrical contracting; scientific facility construction; scientific facility maintenance and repair; laboratory maintenance; laboratory experiments; custodial services; and housekeeping services.

110.    BNL's VOC and TVOC use, discharge, release, discard and disposal practices caused severe and pervasive pollution, contamination and exposure risks at the site.

**BNL's TCE Use, Contamination & Exposure Risks**

111.    AUI and BSA extensively used TCE at BNL during the period 1947 – 2006 if not later, in pertinent part, as a solvent, degreaser, cleaning agent and disinfecting agent despite its known toxicity to humans.

112.    AUI and BSA extensively used TCE at BNL during the period 1947 – 2006 if not later in many different activities including, but not limited to, the following: machining; metalworking; metal fabricating; milling; supercomputer operations; computer network maintenance, repair and reconfiguration; electrical equipment maintenance and repair; telephone and telecommunications maintenance and repair; information technology equipment maintenance and repair; construction; electrical contracting; scientific facility construction; scientific facility maintenance and repair; laboratory maintenance; laboratory experiments; custodial services; and housekeeping services.

113.    AUI and BSA extensively used TCE at BNL in the course of work, operations, services, research and other activities during the period 1947 – 2006 if not later in Buildings 515, 479, 462, 490, 460, 463, 931, 422, 815, 555, 911, 830, 835, 734, 930, 480, 400, 902, 740, 326, 703, 817, 197, 510, 120, 901, 427, visitor housing accommodations, and many other buildings, structures facilities, and locations.

114.    AUI and BSA extensively used TCE at BNL during the period 1947 – 2006 if not later in the Relativistic Heavy Ion Collider, Alternating Gradient Synchotron, National Synchotron Light Source II, Accelerator Test Facility, Tandem de Graaff Electrostatic Accelerator, Space

Radiation Laboratory and computational science supercomputer research laboratories and other scientific facilities.

115.    AUI and BSA extensively used TCE at BNL during the period 1947 – 2006 as work supplies and materiel given to computer operators, computer network technicians, information technology technicians, electronic technicians, telephone technicians, telecommunications technicians, machinists, metalworkers, scientific facility technicians, electricians, construction laborers, riggers, custodians and housekeepers for use in their customary, habitual and routine work activities, responsibilities and duties.

116.    AUI and BSA extensively used TCE at BNL as work supplies and materiel dispensed to workers who were employees, contractors and/or subcontractors.

117.    AUI and BSA extensively purchased, ordered, delivered, stored, dispensed and used TCE at BNL in aerosol, spray, liquid and bulk form.

118.    AUI and BSA extensively purchased, ordered, delivered, stored, dispensed and used TCE at BNL in the forms of aerosol can/bottle, spray can/bottle, bottled liquid, 55 gallon drum/barrel and liquid bulk delivery for tank storage.

119.    Among the uses of TCE at BNL by AUI and BSA employees, contractor and/or subcontractors were the following:

120.    Computer operators and technicians at BNL were supplied TCE to use in aerosol can/bottle, spray can/bottle, and bottled liquid form as solvents, degreasers and cleaning solutions to clean micro-debris and particles off the head drives, tape drives and other components of supercomputers between computer tape spool changes. These workers performed this process on 96 separate occasions or more per day during an 8 hour shift. These technicians worked in Buildings 515 and other buildings, structures, facilities and locations containing supercomputers.

121.    Computer network technicians, information technology technicians, electronic technicians, telephone technicians, and telecommunications technicians at BNL were supplied TCE in aerosol can/bottle, spray can/bottle, and bottled liquid form as solvents, degreasers and cleaning solutions to clean circuit boards, transistors, silicon chips, wiring, wire connections, electrical and mechanical components, supercomputers, computers, and electrical, telephone, and telecommunications equipment. These workers performed this process hundreds of times per day during an 8 hour shift. These technicians worked in Buildings 515, 479, 462, 490, 902 and many other buildings, structures facilities, and locations throughout BNL.

122.    Electricians, construction laborers and other tradesmen at BNL were supplied TCE in aerosol can/bottle, spray can/bottle, and bottled liquid form as solvents, degreasers and cleaning solutions to clean electrical switchbox components, gear box components, piping, conduit, connections, solid state circuits, circuit boards, wiring, and adapters during construction work and activities, including construction of the RHIC during the ISABELLE

Project at the Ring, Section Facility Stations, Injection, Ejection, Heavy Ion Transfer Tunnel, Building 902 and other locations. These workers performed this process hundreds of times per day during an 8 hour shift. The workers also used TCE in the RHIC tunnels. The workers also stood in groundwater that seeped into the tunnels during ongoing excavations.

123.    Machinists, metalworkers, millers, fabricators and machine shop workers at BNL were supplied TCE in liquid, drum, barrel and bulk form as solvents, degreasers and cleaning solutions to clean metal parts, components, apparatus, equipment, appliances, articles and objects before installation and operations. These workers performed this process hundreds of times per day during an 8 hour shift. The workers worked in Buildings 479, 462 and many other buildings, structures, facilities, and locations throughout BNL.

124.    Scientific facility technicians at BNL were supplied TCE in aerosol can/bottle, spray can/bottle, bottled liquid, liquid, drum, barrel and bulk form as solvents, degreasers and cleaning solutions to clean portions of the Relativistic Heavy Ion Collider, Alternating Gradient Synchotron, National Synchotron Light Source II, Accelerator Test Facility, Tandem de Graaff Electrostatic Accelerator and other scientific facilities in between experiments. These workers performed this process hundreds of times per day during an 8 hour shift.

125.    Riggers, custodians and housekeepers were supplied TCE in aerosol can/bottle, spray can/bottle, bottled liquid, liquid, drum, barrel and bulk form as solvents, degreasers and cleaning solutions to clean and disinfect numerous locations throughout the BNL site

including, but not limited to, Buildings 515, 479, 462, 490, 460, 463, 931, 422, 815, 555, 911, 830, 835, 734, 930, 480, 400, 902, 740, 326, 703, 817, 197, 510, 120, 901, 427, visitor housing accommodations and many other buildings, structures facilities, and locations throughout BNL.

126.   AUI and BSA advised, instructed, directed and/or ordered workers to discharge, release, discard and dispose of TCE after use in sink, basin and floor drains, sewers, septic sewer system, sewer pipes, cesspools, soils, trenches, shafts, holes, discharge basins and landfills.

127.   TCE was known to be toxic to humans in the 1950's.

128.   TCE was banned from use in food and pharmaceutical production throughout most developed nations in the world by the 1970's.

129.   TCE was considered a probable and/or suspected human carcinogen by the 1970's.

130.   In 1978, toxicology researchers at BNL published an article in a peer reviewed toxicology and pharmacology scientific journal that described experiments designed to measure the toxicity of TCE and TCE in combination with other volatile organic compounds and chemicals; the article discussed experiment results that suggested the toxicity of TCE existed whether the exposure was exclusive or as a compound in combination with other chemicals.

131.    The USEPA declared BNL a Superfund Site in 1989, in pertinent part, due to severe and pervasive environmental pollution and toxic contamination with TCE and other VOCs, in the buildings, structures, facilities, groundwater, soil, waste disposal system, sewer system, cesspools and surface waters throughout the site. USEPA divided BNL into "Operating Units" designated I – VII.

132.    According to federal documents, the toxicity of TCE to humans and the hazards, dangers and risks the chemical presented to human health, safety and welfare to humans was scientifically established to the extent that the USDOE banned the use of the toxic chemical at its facilities in 1990.

133.    After USDOE issued bulletins and memoranda to all U.S. national laboratories in 1990 banning the use of TCE at the facilities, AUI managers instructed the employees to "stockpile" as much TCE as possible and amass the TCE "stockpile" through facilitating the purchase, order, delivery, distribution, storage and maintenance of TCE products in aerosol can/bottle, spray can/bottle, bottled liquid, drum/barrel and bulk form. AUI managers explained that TCE was an optimal choice for use as a solvent, degreaser, cleaning agent and disinfection agent throughout the BNL site. Subsequently, AUI amassed a huge stockpile of TCE in aerosol, liquid and bulk form consisting of aerosol cans, spray bottles, 55 gallon drums and storage tanks.

134.    Despite the USDOE TCE use ban in 1990, AUI and BSA continued to use TCE at BNL in the foregoing described manner by employees, contractors and/or subcontractors during

the period 1990 – 2006 if not later. MARINO and other BNL workers used TCE products drawn off of the huge stockpile amassed by AUI and BSA in contravention to the USDOE TCE ban in 1990.

135.    AUI and BSA continued to supply BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, with TCE in aerosol can/bottle, spray can/bottle, bottled liquid, drum/barrel and bulk form to use in the course of their work activities, responsibilities and duties during the period 1990 – 2006 if not later.

136.    AUI and BSA continued to order and direct BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, to use TCE at BNL in aerosol can/bottle, spray can/bottle, bottled liquid, drum/barrel and bulk form in the course of their work activities, responsibilities and duties during the period 1990 – 2006 if not later.

137.    The vast majority of the TCE products used by AUI and BSA at BNL were (1) DOW CHEMICAL's "Triclene", "Tri-Clene", "Tri-Clean" and other similar TCE aerosol, liquid and liquid bulk products and (2) ZEP's "Aero-Solv II", and "Power-Solv II" and other similar TCE aerosol, liquid and liquid bulk products. DOW's "Triclene", "Tri-Clene", "Tri-Clean" and other similar TCE aerosol, liquid and liquid bulk products were used mostly before 1990; ZEP's "Aero-Solv II", and "Power-Solv II" and other similar TCE products were used mostly after 1990.

138.    AUI and BSA did not provide BNL employees, contractors and/or subcontractors,

including JOSEPH MARINO, using TCE with protective equipment and measures including respirator masks, barrier gloves, protective garments and adequate ventilation to prevent, avoid and/or limit hazardous occupational exposures in the course of their work activities, responsibilities and duties.

139.    AUI and BSA did not properly and adequately protect BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, using TCE from the hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

140.    AUI and BSA did not properly and adequately warn BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, using TCE about the hazards, dangers, and risks  to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness during the period 1947 – 2006 if not later.

141.    AUI and BSA did not properly and adequately instruct, educate or inform BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, using TCE about the hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

142.    AUI and BSA did not properly and adequately provide to BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, instructions for the safe uses of TCE to prevent, avoid and/or limit unreasonable risks of harm.

143.    AUI and BSA did not properly and adequately provide for the safe discharge, release, discarding and disposal of TCE at BNL and consequently subjected employees, contractors, and/or subcontractors, including JOSEPH MARINO, to increased hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

144.    AUI and BSA did not provide to BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, the manufacturers' warnings about TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

145.    AUI and BSA did not provide to BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, the manufacturers' instructions about preventing, avoiding and/or limiting TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

146.    The DOW CHEMICAL and ZEP TCE products purchased, ordered, delivered, distributed, stored, maintained, dispensed and supplied to workers by AUI and BSA at BNL did not have proper and adequate warnings about the hazards, dangers, and risks to human health, safety and welfare including the risks of carcinogenicity, toxicity, injury and illness.

147.    The DOW CHEMICAL and ZEP TCE products purchased, ordered, delivered,

distributed, stored, maintained, dispensed and supplied to workers by AUI and BSA at BNL did not have proper and adequate instructions advising users to prevent, avoid and/or limit the hazards, dangers, and risks to human health, safety and welfare including the risks of carcinogenicity, toxicity, injury and illness.

## BNL's TCE, PCE, VOC, TVOC & Toxic Chemical Pollution & Contamination Levels: 1994 – 2006

148.    BNL's TCE use, discharge, release, discard and disposal practices caused severe and pervasive pollution, contamination and exposure risks in the laboratory and on the site.

149.    In 1994, a BNL consulting engineers' report described a "TCE Spill Area" on Brookhaven Avenue directly in the middle of the campus in the most densely populated area containing most of the buildings, structures and facilities on the site. The "TCE Spill Area" was located in the EPA's Superfund Site "Operating Unit III" (OU III).

150.    The 1994 engineering report also described analysis of cesspool sludge sampling near Building 919 that found TCE contamination levels at 300,000 µg/kg. The analysis implied massive TCE pollution and contamination as a result of negligent disposal practices into drains emptying to the sewers, septic sewer system and cesspools with consequent leakage into soils, surface waters, groundwater and the underlying aquifer. The report warned that the "presence of high levels of …… TCE at this location represents a potential source of groundwater contamination".

151.    A 1996 USEPA report on BNL contamination contains tables showing elevated levels of

TCE in the groundwater 4 times the above the federal and state standards for maximum contaminant level (MCL). The federal and state standards are 5 MCL; however, the report showed that the TCE contamination level in groundwater was 20 MCL.

152.    A USEPA report on BNL contamination, dated April 14, 2000, stated that "[t]richloroethene (TCE) was detected in wells above the MCL of 5 ppb at levels ranging from 7 to 27 ppb, primarily in the area between Princeton Avenue and the South Boundary Road."

153.    This USEPA report from the year 2000 also states,

> "[t]he VOCs found in the Magothy aquifer above the drinking water standard off-site in the OU III groundwater plume were carbon tetrachloride at 7090 ppb, chloroform at 45 ppb, and trichlorothene (TCE) at 30 ppb. These data are from the 1998 and 1999 sampling of an off-site monitoring well located 275 to 285 feet below land surface within the Magothy Aquifer that was sampled as part of our going groundwater monitoring program. The depth of the monitoring well is 275 to 285 feet below land surface (approximately 187 to 197 feet below mean sea level)".

154.    The 2000 USEPA report also identifies the "TCE Spill Area" as a location where TCE was directly discharged onto the ground in the 1950's.

155.    This 2000 USEPA report contains a table that shows excessive TCE contamination levels were found in soils (0.7 mg/kg), subsurface soils (0.06 mg/kg), surface water (11 µg/L) and groundwater (5 µg/L).

156.    This USEPA report also showed excessive PCE contamination levels:

> "Tetrachloroethene (PCE) was found in the vicinity of Building 96 in the water-

table zone and in the deep glacial zone near the site boundary. PCE in groundwater samples ranged from 10 to 15,000 ppb. The main source of the PCE is the area immediately south of Building 96, which had been used as a truck-wash station and drum-storage area. In the water-table zone, the PCE plume is approximately 1,600 feet long by 500 feet wide. In the mid-glacial it is about 4,400 feet long by 600 feet wide."

"The greatest potential for transport of contaminants at the OU HI site is via groundwater transport. Volatile organic compounds, including PCE, TCA, and carbon tetrachloride, have been detected in groundwater plumes indicating their ongoing transport."

"An additional risk assessment was done for the future receptors, assuming exposure to the VOC groundwater plumes identified in OU III (TCA, PCE and carbon tetrachloride). The conservative assumption was made that in the future (30 years) houses would be built near the highest detected concentrations of these on-site plumes, and the residents would use the residential wells as the sole water supply for domestic uses. The risk to a future resident using groundwater at the highest concentration of carbon tetrachloride and PCE exceeds the acceptable risk range. Estimated risks to an adult from exposure to carbon tetrachloride and PCE in groundwater were $6 \times 10^{-4}$ and $5 \times 10^{-3}$ respectively. Estimated risks to a child from exposure to carbon tetrachloride and PCE in groundwater were $3 \times 10^{-4}$ and $2 \times 10^{-3}$. Under this highly unlikely scenario, the presence of TCA, PCE and carbon tetrachloride plumes in groundwater on-site could pose a potential health concern for a future resident."

157. This USEPA report contains the same table that shows excessive PCE contamination levels were found in soils (1.4 mg/kg), subsurface soils (0.06 mg/kg), and groundwater (5 μg/L).

158. Also in 2000, USEPA issued groundwater survey maps showing plumes of toxic chemical and radioactive isotope contamination underlying BNL's OU III, i.e., the location on the site with the highest daily population density and highest number of occupied buildings, structures and facilities (see, Exhibit 1, USEPA OU Map). The groundwater survey maps consisted of those depicting plumes for TVOCs (see, Exhibit 2, TVOC Groundwater Plume Map), Strontium – 90 (see, Exhibit 3, Strontium – 90 Groundwater

Plume Map), Tritium (see, Exhibit 4, Tritium Groundwater Plume Map), and TVOCs – Strontium – 90-Tritium Combined (see, Exhibit 5, Combined Contaminant Groundwater Plume Map).

159.    BNL issued its own report entitled "Groundwater Protection Management Program Description", dated May 31, 2002, authored by Paquette, Bennett and Dorsch. The report showed that considerable TCE and PCE contamination were still present despite remediation actions at various locations within the site. In pertinent part, the report by Paquette, et al., states:

"Figure 7. Map of BNL CERCLA Areas of Concern/Operable Units

Operable Unit I: The OU I areas of concern deal with both chemical and radiologically contaminated soils and groundwater at the former Hazardous Waste Management Facility (HWMF),[6] and the Former Landfill and Current Landfill areas. *As a result of historical waste handling and disposal practices and accidental spills, soil and groundwater within the HWMF have been contaminated with VOCs and radionuclides*. Groundwater investigations have detected VOCs such as 1,1,1-trichloroethane (TCA), *trichloroethylene (TCE), tetrachloroethylene (PCE)*, 1,1-dichloroethane (DCA), and 1,1-dichloroethylene (DCE). Radionuclides such as tritium and strontium-90 have also been detected in the groundwater. Residual contaminants of concern found in the soils at the facility are cesium-137 and strontium-90
……

Operable Unit V: The areas of concern for OU V include: the Sewage Treatment Plant (STP) (AOC 4a through 4e); leaking sanitary lines (AOC 21); eastern tritium plume (AOC 23 East); and the Peconic River (AOC 30). The primary concern in this OU is the historical contaminant discharges to the BNL Sewage Treatment Plant (STP), which has been in continuous operation since 1947. Remedial investigation have identified contaminated soils near the STP filter beds, contaminated sediments within the Peconic River and an off-site TCE plume (ITC/G&M, 1998a; ITC/G&M, 1998b).

Air Sparge/Soil vapor Extraction Remediation System (AOC 5): In 1977, a 23,000 to 25,000 gallon mixture of Number 6 fuel oil and mineral spirits was released from a ruptured pipe used to transfer the contents from a UST to aboveground storage tanks at the Central Steam Facility (CSF). *The primary*

*chemical contaminants in the OU IV plume near the 1977 spill site are TCA, PCE, DCE, TCE, toluene, ethylbenzene, and xylenes. In addition, several small spills of Number 6 fuel oil from the CSF fuel unloading area were documented between 1988 and 1993; it also is suspected that small volumes of solvents, such as PCE, were released to the ground near the CSF.*

Air sparge with soil vapor extraction was selected as the remedy for soil and groundwater contaminated with VOCs underlying OU IV. The AS/SVE system has been operating since November 1997. Performance goals for soil cleanup were achieved in 1998 while performance goals were met in August 2000 for groundwater. Subsequently, a formal petition for shutdown was submitted to EPA and NYSDEC and approval for shutdown was received in January 2001. The system was shutdown on January 10, 2001. *However, following the shutdown, groundwater results were received for one well located near the spill site showed a rebound in several VOC parameters* (indicative of fuel oil). Because of this, pulsing of the AS/SVE system was initiated on a weekly basis in February 2001."

(Emphasis added.)

160.    BNL issued a "Final Five Year Report for Brookhaven National Laboratory Superfund Site" in July 2006. In pertinent part, the report stated the following about TCE contamination at the site:

"VOC contaminated groundwater including trichloroethene (TCE) [is] on and off of BNL property"

"Groundwater: *The primary contaminants in the groundwater on and off of the BNL site include trichloroethene (TCE) and tritium. Tritium has not been detected above the drinking water standards, and TCE concentrations are slightly above the standards.*"

(Emphasis added.)

161.    The foregoing U.S. government and BNL reports, records and documents demonstrate that TCE, PCE, VOCs, TVOCs and other toxic chemical and radiological contaminants existed at the site that encompassed the period of time that JOSEPH MARINO worked there.

162.    BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, were

41

exposed to TCE, PCE, VOCs, TVOCs, toxic chemicals and radiological contaminants through inhalation, trans-dermal contact, ingestion and vapor intrusion routes.

163.    The TCE and PCE exposures to BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, were well beyond the maximum contamination levels and substantially in excess of the parts per million and parts per billion standards set by applicable scientifically established and accepted exposure limits (e.g., SEL, REL and PEL).

**BNL Site Exposure Matrices**

164.    The U.S. Department of Labor (USDOL), USDOE and USEPA compiled and analyzed BNL pollution and contamination data and operating contractor records to publish "Site Exposure Matrices".

165.    The USDOL BNL "Site Exposure Matrices" were established to identify human health risk exposure sources at BNL buildings, structures, facilities, and locations; identify exposure sources by BNL occupations and job categories; and identify BNL exposure sources by toxic chemical, toxic substance and radioactive isotopes.

166.    Examples include, but are not limited to, the following:

167.    The BNL Site Exposure Matrix for Building 515 states that "Trichloroethylene" (TCE) was a toxic chemical used in this location. Among the TCE products used at this location were DOW's Triclene, Tri-Clene and Tri-Clean and ZEP's Power-Solv II. ZEP's Power-

Solv, Aero-Solv and Aero-Solv II was also used in this location too.

168.   The BNL Site Exposure Matrix for Building 479 states that "Trichloroethylene" (TCE) was a toxic chemical used in this location. Among the TCE products used at this location were DOW's Triclene, Tri-Clene and Tri-Clean and ZEP's Power-Solv II. Tetrachloroethylene (PCE) was also used at this location too.

169.   The BNL Site Exposure Matrix for Building 462 states that "Trichloroethylene" (TCE) was a toxic chemical used in this location. Among the TCE products used at this location were DOW's Triclene and Tri-Clene and ZEP's Power-Solv II. Tetrachloroethylene (PCE) was also used at this location too.

170.   The BNL Site Exposure Matrix for "Trichloroethylene" states that it was used for information technologies activities, applied mathematics activities, circuit board washing, electrical, mechanical and powerline maintenance, physics and medical research, "laboratory activities", electrical renovation, metal degreasing, machining, parts fabricating, sheet metal fabricating, metalworking and numerous other activities. This SEM also shows that TCE was used at Buildings 515, 479, 462 and many other buildings, structures, facilities and locations and in scientific facilities including the Relativistic Heavy Ion Collider (RHIC), Alternating Gradient Synchotron (AGS) and National Synchotron Light Source II (NSLS II).

### Joseph Marino's Experiences at BNL as a Computer Network Technician

171.    JOSEPH MARINO, now 60 years old, worked at Brookhaven National Laboratory as a computer technician repairing, maintaining, servicing and reconfiguring computers and supercomputers throughout the site.

172.    MR. MARINO was the employee of Carlyle Technical Services and Entex, Inc., during the time he worked at BNL providing computer technology services.

173.    MARINO was assigned by Carlyle and Entex to BNL during the period September 20, 1999 – December 31, 2000. BSA was the BNL "operating contractor" during this period of time.

174.    The nature of the relationship between Carlyle and Entex to BSA is unknown to MARINO.

175.    Mr. MARINO extensively used TCE for his work activities, duties and responsibilities at BNL's Buildings 515 (Information Technology Division) and many other buildings, structures, facilities and locations at the site.

176.    MARINO used mostly ZEP's Power-Solv II and Aero-Solv II though he occasionally used DOW's Triclene.

177.    MARINO used the DOW and ZEP TCE cleaning solvents in many places at BNL;

however, he only used TCE at BNL.

178.    MARINO worked for contractors as a computer network technician in several other locations during his career but he never used TCE in any place other than BNL.

179.    MARINO used TCE cleaning solvents on a daily basis in the course of his work duties pursuant to the directions of BSA managers.

180.    MARINO used TCE cleaning solvents hundreds of times per day over an 8 hour plus shift in the course of repairing, maintaining, servicing and reconfiguring BNL's computers and supercomputers.

181.    MARINO serviced, repaired, maintained and/or reconfigured more than 100 computers per month while working at BNL.

182.    MARINO was directed, instructed and told to use TCE cleaning solvents (ZEP's Power-Solv II and Aero-Solv II and DOW's Triclene) by BNL managers and employees in the course of his work activities, duties and responsibilities.

183.    MARINO was supplied and dispensed TCE cleaning solvents (ZEP's Power-Solv II and Aero-Solv II and DOW's Triclene) by BNL managers and employees.

184.    MARINO used TCE cleaning solvents in aerosol spray form dispensed out of cans and bottles hundreds of times per day pursuant to the directions and instructions of BNL managers.

185.    MARINO was aware that other BNL computer network technicians, computer technicians and computer operators were using the same TCE cleaning solvents.

186.    MARINO was aware that the use of TCE cleaning solvents by the BNL computer network technicians, computer technicians and computer operators was "heavy" and pervasive.

187.    MARINO and other BNL computer network technicians, computer technicians and computer operators used TCE cleaning solvents in aerosol spray form in buildings, structures, facilities and locations that had poor or no ventilation.

188.    MARINO was once servicing computers in Building 515 at a time when there was considerable TCE cleaning solvent use by the technicians in the room and a BNL manager named Joe Walsh entered the room, waved his hands about, looked at him and exclaimed laughing, "Don't worry, the radiation in this place will kill you before the fumes from that stuff does."

189.    MARINO didn't know what to make of Walsh's comment. Walsh never advised MARINO that TCE could be carcinogenic or toxic.

190.    MARINO left work each day at BNL with the odor of TCE in his nostrils and on his clothing and the taste of TCE in his mouth.

191.    MARINO was also told by other BNL employees that the motto of the laboratory was "Science over safety".

192.    MARINO and other BNL computer network technicians, computer technicians and computer operators used TCE cleaning solvents in aerosol spray form in buildings, structures, facilities and locations that were situated directly over areas with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, toxic chemical and radiological contaminant groundwater plumes.

193.    MARINO and other BNL computer network technicians, computer technicians and computer operators used TCE cleaning solvents in aerosol spray form in buildings, structures, facilities and locations that were situated directly over areas with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, toxic chemical and radiological soil contaminations.

194.    MARINO was exposed to hazardous, dangerous and unsafe levels of TCE exposure delivered through the routes of inhalation, trans-dermal contact, ingestion and vapor intrusion in the ambient indoor air.

195.    BSA did not provide protective measures to MARINO prevent, avoid and/or limit exposures to the hazards, dangers and risks to human health, safety and welfare of TCE cleaning solvents.

196.    BSA did not provide MARINO with such protective equipment and measures as respirator masks, barrier gloves, protective garments and adequate ventilation to prevent, avoid and/or limit hazardous TCE exposures.

197.    BSA did not properly and adequately protect MARINO from the hazards, dangers, and risks to human health, safety and welfare resulting from the use of TCE cleaning solvents.

198.    BSA did not properly and adequately warn MARINO about the hazards, dangers, and risks to human health, safety and welfare resulting from the use of TCE cleaning solvents.

199.    BSA did not properly and adequately instruct, educate or inform MARINO about the hazards, dangers, and risks to human health, safety and welfare resulting from the use of TCE cleaning solvents.

200.    BSA did not properly and adequately provide to MARINO instructions for the safe uses of TCE cleaning solvents.

201.    BSA did not provide to MARINO the manufacturers' warnings about TCE hazards, dangers, and risks to human health, safety and welfare.

202.    BSA did not provide to MARINO the manufacturers' instructions about preventing, avoiding and/or limiting TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

203.    BSA did not provide to MARINO the manufacturers' instructions about safe uses of TCE cleaning solvents.

204.    AUI and BSA did not properly and adequately provide for the safe discharge, release, discarding and disposal of TCE at BNL and consequently subjected MARINO to increased hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

205.    DOW and ZEP did not properly and adequately warn MARINO about the hazards, dangers, and risks to human health, safety and welfare presented by their TCE products including the risks of carcinogenicity, toxicity, injury and illness.

206.    DOW and ZEP did not properly and adequately instruct, educate and inform MARINO about the hazards, dangers, and risks to human health, safety and welfare presented by their TCE products including the risks of carcinogenicity, toxicity, injury and illness.

207.    DOW and ZEP did not properly and adequately instruct MARINO about the safe uses of their TCE products.

208.    AUI and BSA fraudulently concealed from MARINO that BNL was dangerously contaminated and polluted with TCE – and PCE, VOC, TVOC, toxic heavy metals and many other toxic substances – in the ambient indoor air, groundwater, soil and drinking water supply presenting serious risks of harm, injury, illness and death to people on the site.

209.    AUI and BSA fraudulently concealed from MARINO and other workers that the TCE contamination and pollution at BNL presented risks to their health from exposure through inhalational, transdermal, ingestional, and vapor intrusive routes.

210.    On or about March 10, 2009, MARINO was diagnosed with clear cell renal carcinoma in the right kidney.

211.    On or about February 6, 2009, JOSEPH MARINO underwent an MRI with and without contrast of the abdomen at North Shore University Hospital at the direction of Lee Richstone, M.D., after urinalysis revealed abnormalities indicating potential kidney disease. The MRI showed a right kidney mass measuring approximately 8 cm in largest dimension consistent with renal cell carcinoma.

212.    On or about March 10, 2009, Dr. Richstone performed a right laparoscopic nephrectomy on Mr. MARINO to remove the kidney and cancerous mass at North Shore University Hospital. Thesurgical pathology report diagnosed "clear cell renal cell carcinoma Fuhrman grade 2".

213.    Subsequently, Dr. Richstone continued to follow MARINO with regular urologic examinations and diagnostic imaging procedures of the abdomen and chest to monitor for metastatic disease. The postoperative imaging studies during the period 2009 – 2015 were negative for evidence of metastatic disease; left kidney cysts were revealed in an MRI on April 29, 2015.

214.    MARINO developed chronic kidney disease (stage III) in the left kidney that was diagnosed on or about March 1, 2018.

215.    MARINO's treating physician determined that the kidney cancer and chronic kidney disease (stage III) were part of the same toxic renal injury – TCE exposure – manifested over a continuum of time with the possibility of progressive worsening.

216.    MARINO also subsequently developed other consequent medical problems as a result of his toxic exposures to TCE and other toxic substances at BNL.

### TCE Toxicity & Carcinogenicity: The Pathogenic Mechanisms of TCE Exposure for Mutagenic, Genotoxic & Non-Genotoxic Injuries

217.    TCE is classified and accepted as a "known human carcinogen".

218.    TCE is also a toxic substance hazardous to human health in other ways.

219.    TCE was declared a known human carcinogen according to the U.S. EPA, NIH/NIEHS National Toxicity Program, U.S. HHS Agency for Toxic Substances and Disease Registry, U.N. World Health Organization, and WHO International Association for Research on Cancer (IARC) during the years 2011 – 2016.

220.    TCE can cause cancers and other diseases in humans through mutagenic, genotoxic and non-genotoxic mechanisms.

221.    In order of magnitude, pathogenic TCE exposure routes are inhalation, trans-dermal contact, ingestion, and vapor intrusion into enclosed structures.

222.    TCE creates toxic liver metabolites that can have mutagenic, genotoxic and non-genotoxic diseases involving various organs. Mutagenic essentially means that a substance has mutational effects on genes. Genotoxic essentially means that a substance can cause damage to the DNA in cells. Non-genotoxic essentially means that a substance can cause cellular structure damage. The liver metabolites are expressed into bile and blood.

223.    The biochemical pathways by which TCE is metabolized include, but are not limited to, the following two well-known and scientifically established mechanisms:

224.    The cytochrome P450 pathway, which is oxidative, impacts the liver, and appears to produce relatively stable metabolites, if not overloaded.

225.    The glutathione-S-transferase (GST) pathway, which is reductive, and produces some reactive and mutagenic products, is nephrotoxic and can cause or contribute to kidney cancers, liver cancers, non-Hodgkin's lymphomas, and other cancers, and kidney failure, liver failure, and other organ failures and damage.

226.    Both of these enzymes are highly expressed in liver cells but also expressed widely in other organ tissues as well including kidney. They are what are known as conjugation molecules.

227.    The enzyme GST-A1-1 is produced in the glutathione-S-transferase (GST) pathway.

228.    There are many variants (encoded by different genes) that act in detoxification pathways, the chemical transformations that enable cells (and therefore organs) to export and excrete potentially dangerous compounds.  Kidney cells are set up to export and excrete these dangerous compounds; therefore, this organ can be damaged when the pathway produces a reactive intermediate.

229.    The liver is the location where the focus of the action starts in this process.

230.    The GST-A1-1 enzyme (GST) binds two small molecules, known as conjugation molecules or conjugates, one is glutathione and the other is TCE. The TCE is known as the "target" molecule in this case. The enzymes are able to bind a range of targets. When both molecules are bound to the protein, it catalyzes the linkage of the two to produce a

glutathione-TCE conjugate or conjugation molecule. This conjugation molecule, known as DCVG, is pathogenic and dangerous to humans.

231. TCE conjugation and its mutagenic potential in the kidney and urinary tract occurs as follows:

232. TCE metabolism by the GSH conjugation pathway is initiated by the action of GSH S-transferase (GST) enzymes.

233. The first step in this pathway is an SN2 nucleophilic displacement reaction of TCE with GSH, releasing Cl- ion and S-(1,2- dichlorovinyl) glutathione (DCVG) as products.

234. Although this initial GSH conjugation step can occur in many tissues, it occurs primarily in the liver owing to first-pass metabolism and the high content of GSTs. In the human and rat liver, the various GST isoforms can account for as much as 5% of total cytosolic protein. Subsequent metabolism through the GSH conjugation pathway occurs primarily in the kidneys.

235. As noted above, although quantitatively the liver is the primary site of GSH conjugation of TCE in the body, the liver is very efficient at excreting GSH conjugates into either bile or plasma.

236.    Subsequently, through enterohepatic and renal-hepatic circulation, generally either the cysteine conjugate DCVC or the mercapturate NAcDCVC is delivered to the kidneys for further metabolism or excretion.

237.    Additionally, in situ GSH conjugation of TCE can occur within the kidneys themselves, primarily the proximal tubules establishing an intra-organ cycle of GSH conjugate transport and metabolism.

238.    TCE metabolites formed through the GSH conjugation pathway DCVG, whether formed within the kidneys or in the liver, is processed predominantly in the kidneys by a sequence of two hydrolytic enzymes on the proximal tubular brush-border membrane, $\gamma$-glutamyltransferase (GGT) and cysteinylglycine dipeptidase (DP), to yield the corresponding cysteine conjugate, S-(1,2-dichlorovinyl)-L-cysteine (DCVC).

239.    DCVC was first discovered more than 50 years ago in soybean meal as a by-product of TCE extraction. It was identified as the agent causing nephrotoxicity and aplastic anemia in cows, but only nephrotoxicity in most other species. Lock and colleagues verified that DCVC indeed produced both nephrotoxicity and aplastic anemia in cattle, but further showed that none of the other haloalkenyl cysteine conjugates studied caused aplastic anemia in addition to the characteristic nephrotoxicity.

240.    DCVC can be viewed as a major branch point in this metabolic pathway, as it can have three possible fates.

241. First, DCVC can be N-acetylated by the microsomal cysteine conjugate N-acetyltransferase (NAT) to form the mercapturate N-acetyl-S-(1,2- dichlorovinyl)-L-cysteine (NAcDCVC).

242. Besides excretion into urine, NAcDCVC can be deacetylated within the renal proximal tubular cell by aminoacylase III to re-form DCVC.

243. Additionally, mercapturates of several nephrotoxic haloalkenes, including NAcDCVC, are substrates for CYP3A enzymes to yield sulfoxides. Thus, although NAcDCVC is considered a stable end-product of TCE metabolism and is recovered in urine, it can undergo additional metabolic transformations that serve to reactivate it. These additional fates of the putative end-product of the GSH conjugation pathway highlight both the complexity of TCE metabolism by this pathway and the potential difficulties in using urinary NAcDCVC as a surrogate measurement for overall flux through the GSH conjugation pathway.

244. Second, DCVC can be a substrate for cysteine conjugate β-lyase (CCBL) activities to generate the reactive S-(1,2-dichlorovinyl)thiol (DCVT). DCVT spontaneously rearranges to form either chlorothioketene (CTK) or chlorothionoacetyl chloride (CTAC). Both of these species are chemically unstable and reactive and are believed to be responsible for formation of covalent adducts derived from DCVC with nucleic acids, proteins, and phospholipids.

245.    CCBL activity has been detected not only in the kidneys, but in liver, urinary tract, lymph nodes and other organs and tissues as well. Only renal, as opposed to extra-renal, CCBL activity is toxicologically important for kidney toxicity because of the tissue localization of plasma membrane transporters and several of the enzymes of the GSH conjugation pathway that determine the distribution of TCE metabolites. The overall β-lyase reaction mechanism is cleavage of a C-S bond to yield a reactive, thioacylating species. The reaction mechanism can occur by either direct β-elimination or transamination with a suitable α-keto acid co-substrate to yield either the thiolate or a propionic acid derivative, respectively. The latter is chemically unstable and rearranges to release the thiolate. According to Cooper and colleagues, many distinct mammalian enzymes are known to be capable of catalyzing the CCBL reaction. Some of the CCBL enzymes catalyze both β-elimination and transamination reactions, whereas others can only catalyze the former reaction.

246.    Third, DCVC can be a substrate for the flavin-containing monooxygenase (FMO), yielding a reactive S-(1,2-dichlorovinyl)-L-cysteine sulfoxide (DCVCS). The FMOs, like the CYPs, represent a multigene family of enzymes. Both enzyme systems also share several other characteristics, including localization in the endoplasmic reticulum, requirement for NADPH as a reductant, and overall catalysis of a mixed-function oxidation reaction.

247.    Differences do exist, however, that make some of the functions of the FMOs rather distinctive. For example, although there are more than 50 individual functional CYP enzymes from > 40 gene families in humans, there are only 5 FMO genes in mammals.

248.    FMOs catalyze oxidation of sulfur-, selenium-, and nitrogen-containing chemicals. Although FMOs and some CYPs share substrates and catalyze the same overall reactions, FMOs have some distinctive substrates, including cysteine S-conjugates of various haloalkenes and haloalkanes.

249.    Because of the reactive nature of the various intermediates from this pathway, only NAcDCVC has been recovered in urine of both experimental animals and humans exposed to TCE or DCVC. Of the two possible bioactivation pathways for DCVC, the CCBL and FMO reactions, the former has received the most attention and probably accounts for most of the bioactivation activity for DCVC.

250.    TCE is classified and accepted as a "known human carcinogen" and a toxic substance hazardous to human health by agencies of the U.S. government, International Association of Research on Cancer, and a broad consensus of knowledgeable experts in the fields of science and medicine.

251.    TCE used and misused by AUI at BNL was improperly allowed to pervasively pollute and contaminate the site and present hazards, dangers, and risks to human health, safety and welfare to those people at, on or in the vicinity of the site, including JOSEPH MARINO.

252.    MARINO's exposure to TCE at BNL by inhalation, trans-dermal contact, ingestion and vapor intrusive routes caused, contributed to and were substantial factors resulting in his right renal clear cell carcinoma, left chronic kidney disease (stage III), and consequent injuries,

illnesses and diseases through the foregoing described mutagenic, genotoxic and non-genotoxic pathogenic mechanisms.

**PCE Toxicity & Carcinogenicity**

253.    Similar to its close cousin trichloroethylene (TCE), tetrachloroethylene (PCE)[9], is a synthetic small molecule that was widely used throughout the twentieth century as a cleaning solvent and degreasing agent.

254.    PCE is classified as a known environmental pollutant and health hazard, and there are recommendations and regulations placed upon it by the USEPA, OSHA, and NIOSH.

255.    PCE has a molecular weight of 165.83 g/mol and a vapor pressure of 18.47 mmHg at room temperature (compared with 22.4 mmHg for water and 74 mmHg for TCE), and is considered a volatile organic compound (VOC) that readily vaporizes in air.

256.    PCE is not by itself cytotoxic or otherwise immediately harmful to the body; however its metabolized derivatives are. Once in the body, PCE is either metabolized via cytochrome P450 or undergoes conjugation to glutathione thereby leading to the formation of a wide number of toxic metabolites, including but not limited to NAcTCVC, NAcTCVCS, TCVC, and TCOH. While all of these compounds have been indicated in both *in vitro* and *in vivo* experiments to be renal toxins, TCVC accounts for the majority of the renal toxicity.

---

[9] Tetrachloroethylene is also known as perchloroethylene, PEC or PERC.

257.    PCE enters the body via inhalation, ingestion, trans-dermal, and vapor intrusion from the air, water, and soil. These modes of contact will also lead to PCE absorption into the body since the chemical is a small molecule that can diffuse through the lungs, skin and digestive tract.

258.    The most common route of entry for PCE is through inhalation due to the volatility of the compound but also how slowly PCE breaks down in air (half-life estimated to be between 70-250 days).

259.    Although PCE is a VOC, its relatively low vapor pressure means that a decent quantity will remain in the liquid phase when exposed to air but it is sufficiently volatile so as to cause vaporization sufficient for toxicity through inhalation, ingestion and vapor intrusion routes.

260.    Although PCE is generally thought of as non-soluble, PCE will dissolve in water and migrate into groundwater and aquifers.

261.    Vapor intrusion also allows for PCE to migrate upwards once buried in the ground; therefore, common routes of entry given a contaminated water source are numerous and include inhalation, ingestion and vapor intrusion routes.

262.    PCE can diffuse through PVC (polyvinylchloride) water pipes to contaminate water supplies.

263.    PCE has a degradation half-life of about 1-2 years in groundwater; however, known sites of PCE contamination have continued to exist more than 15-20 years after contamination sources ceased to exist.

264.    Whether exposure is through inhalation, ingestion, trans-dermal or vapor intrusion, PCE will enter the bloodstream and be metabolized by cells into the previously mentioned toxic byproducts.

265.    PCE will generally be readily exhaled or excreted; however, the metabolic pathway from PCE to toxic metabolites proceeds quickly, and despite the rapid loss of PCE in the body, the production of toxins will have already occurred prior to total exhalation or excretion.

266.    Chronic PCE exposure results in the sequestering of the chemical in fat cells for prolonged or persistent exposure because the chemical is lipid-soluble[10].

267.    Chronic PCE exposure has been linked to cancers and dysfunctions in the bladder, liver, kidneys, urinary tract, blood, lymph nodes, esophagus, cervix, central nervous system and other organs and tissues.

268.    PCE has been associated with neurological deterioration in humans; however, this correlation was established in studies on workers who had routing exposures to PCE vapor at concentrations over 100 ppm.

---

[10] WHO Guidelines for Indoor Air Quality 2010.

269.     The hazards, dangers and risks to human health, safety and welfare presented by PCE exposure are known and described in various peer reviewed scientific journals.

270.     PCE is hepatotoxic, nephrotoxic, and carcinogenic particularly to the bladder[11], kidneys, urinary tract, liver, blood, lymph nodes, esophagus, cervix and central nervous system.

271.     Chronic PCE exposure over the EPA and OSHA-mandated regulations has been shown to lead to these cases.

272.     Well documented studies show PCE exposure is causally connected to cancers and/or injury to the kidneys, urinary tract, liver, blood, lymph nodes, esophagus, cervix and central nervous system.

273.     Recent retrospective cohort studies reflect scientific evidence sufficiently demonstrating a causal connection between PCE exposure and liver, kidney, bladder, urinary tract, liver, blood, lymph nodes, esophageal, cervical and central nervous system cancers and/or injury.

274.     Aside from TCE, PCE used and misused by AUI at BNL was also improperly allowed to pervasively pollute and contaminate the site and present hazards, dangers, and risks to human health, safety and welfare to those people at, on or in the vicinity of the site, including JOSEPH MARINO.

---

[11] Lash, L. and Parker, J. *Hepatic and renal toxicities associated with perchloroethylene*. Pharmacological Reviews, 2001, 53:177–208

275.    MARINO's exposure to PCE at BNL by inhalation, trans-dermal contact, ingestion and vapor intrusive routes contributed to and was a substantial factor resulting in his right renal clear cell carcinoma, left chronic kidney disease (stage III), and other illnesses and injuries through the foregoing described mutagenic, genotoxic and non-genotoxic pathogenic mechanisms.

### VOC, TVOC & Other Chenical Substance Toxicity & Carcinogenicity

276.    Aside from TCE and PCE, other VOCs, TVOCs, toxic heavy metals, benzenes and other toxic chemicals used and misused by AUI at BNL were also improperly allowed to pervasively pollute and contaminate the site and present hazards, dangers, and risks to human health, safety and welfare to those people at, on or in the vicinity of the site, including JOSEPH MARINO.

277.    MARINO's exposure to VOCs, TVOCs, toxic heavy metals, benzenes and other toxic chemicals at BNL by inhalation, trans-dermal contact, ingestion and vapor intrusive routes contributed to and was a substantial factor resulting in his right renal clear cell carcinoma, left chronic kidney disease (stage III), and other illnesses and injuries.

### BNL's Federal Law, DOE Policy and Operating Contract Violations

### Federal Law Violations

278.    USEPA and New York State Department of Environmental Conservation (NYSDEC) performed an environmental audit and inspection of BNL during 1997 – 1998.

279.   NYS AG Vacco's report, dated October 16, 1997, entitled "Brookhaven National Laboratory: At The Crossroads", described some of the results of the USEPA and NYSDEC audit and inspection:

> "The involved agencies each stressed that the contamination posing the most serious threat was caused by _chemical wastes_, not tritium or other radioactive contaminants. These _chemical wastes_ include 1.1.1,-trichloroethane ("TCA"), EDB, carbon tetrachloride, and _trichloroethylene ("TCE")_. …… The Review found that TCA and _TCE_, _commonly used in many Laboratory facilities as equipment degreasers, were often discharged to sinks and drains or poured directly onto the ground_."

(Emphasis added.)

280.   The USEPA's inspections at BNL resulted in violations of the Safe Drinking Water Act (SDWA), Clean Air Act (CAA), Resource Conservation and Recovery Act (RCRA) and Toxic Substance Control Act (TSCA) issued against AUI on March 9, 1998.

281.   On March 23, 1998, USEPA stated that it cited AUI "for _lapses in compliance with federal rules aimed at protecting public health and the environment at BNL_," including but not limited to violations of the Safe Drinking Water Act, Clean Air Act, Resource Conservation and Recovery Act and Toxic Substances Control Act. (Emphasis added.)

282.   During its tenure as the "operating contractor" at BNL, AUI violated in numerous ways the Safe Drinking Water Act (SDWA), Clean Air Act (CAA), Resource Conservation and Recovery Act (RCRA) and Toxic Substance Control Act (TSCA) and regulations issued pursuant to those statutes.

## **USDOE Policy Violations**

283.  After BSA assumed management of BNL in March 1998, USEPA and USDOE entered into a Memorandum of Agreement (MOA).

284.  Pursuant to the MOA, the "Brookhaven National Laboratory Environmental Stewardship Policy" was implemented stating, in pertinent part, as follows: "It is Brookhaven National Laboratory's (BNL) policy to integrate environmental stewardship into all facets of the Laboratory's missions. We will manage our programs in a manner that *protects the ecosystem and public health*." (Emphasis added.)

285.  Pursuant to the MOA, the "Environmental Management System Project" (EMS) was implemented to establish "a comprehensive Laboratory system for planning, implementing, monitoring and assessing environmental issues at Brookhaven National Laboratory (BNL)" through "adoption of the ISO 14001 Standard" to "satisfy requirements contained in the DOE management contract with Brookhaven Science Associates (BSA)" pertaining to "*environmental protection, health, and safety*." (Emphasis added.)

286.  Pursuant to BNL's "Environmental Management System Project" (EMS), environmental commitments were incorporated into a comprehensive Environmental, Safety, Security, and Health ("ESSH") Policy that prioritized environmental stewardship, the safety of the public and the safety of BNL employees. Contractor and subcontractor employees were considered to be within the definition of "employees" under the "operating contracts",

287.   The Environmental, Safety, Security, and Health Policy (ESSH) focused on the following principles:

> "Environment: We *protect the environment*, conserve resources, and *prevent pollution*. Safety: We *maintain a safe workplace*, and we plan our work and *perform it safely*. *We take responsibility for the safety of ourselves, coworkers, and guests*. Security: We *protect people*, property, information, computing systems, and facilities. Health: We *protect human health within our boundaries and in the surrounding community*. Compliance: We achieve and maintain *compliance* with applicable ESSH requirements."

(Emphasis added.)

288.   During its tenure as the "operating contractor" at BNL encompassing the period of time MARINO was working at that location, BSA violated the foregoing policies by: (1) failing to protect the environment; (2) failing to protect the health, safety and welfare of BNL employees, contractors, subcontractors, visitors and the general public on and in the vicinity of the site; (3)  failing to maintain a safe workplace and perform the work safely; (4) failing to take responsibility for the safety of BNL employees, "coworkers", and "guests"; (5) failing to protect human health within our boundaries and in the surrounding community; and (6) failing to achieve and maintain compliance with federal environmental laws and its own policies.

### Operating Contract Violations

289.   AUI and BSA violated those provisions of the "operating contract" that required them to protect workers, the public and the environment.

290.    The "operating contract" made the safety and health of workers and the public and the protection and restoration of the environment the fundamental responsibilities of the "operating contractor".

291.    The "operating contract" required that the "operating contractor" ensure all work activities are performed in a manner that prevented fatalities, minimized injuries and illnesses, minimized exposures to hazardous substances and materials, prevented environmental releases of dangerous substances and prevented property loss.

292.    The "operating contract" required that the "operating contractor" ensure the identification, mitigation, or elimination of workplace hazards.

293.    The "operating contract" required the "operating contractor" to ensure that subcontractor employees are trained and qualified on job tasks, hazards, DOE and BNL Departmental safety policies, expectations and requirements.

294.    The "operating contract" required the "operating contractor" to ensure that it performed all activities in compliance with applicable health, safety, and environmental laws, orders, regulations, national consensus standards, governing agreements and permits executed with regulatory and oversight government organizations.

295.    The "operating contract" required the "operating contractor" to ensure that safety encompasses environment, safety and health, including pollution prevention and waste minimization.

296.    The "operating contract" defined "employees" to include subcontractor employees.

297.    The "operating contract" required the "operating contractor" to ensure that in performing work under the contract, the contractor shall perform work safely, in a manner that ensures adequate protection for employees, the public, and the environment, and shall be accountable for the safe performance of work.

298.    The "operating contract" required the "operating contractor" to ensure that it exercised a degree of care commensurate with the work and the associated hazards.

299.    The "operating contract" required the "operating contractor" to ensure that management was responsible for the protection of employees, the public, and the environment.

300.    The "operating contract" required the "operating contractor" to ensure that personnel possess the experience, knowledge, skills, and abilities that are necessary to discharge their responsibilities.

301.    The "operating contract" required the "operating contractor" to ensure that protecting employees, the public, and the environment is a priority whenever activities are planned and performed.

302.    The "operating contract" required the "operating contractor" to ensure that before work is performed, the associated hazards are evaluated and an agreed-upon set of ES&H standards and requirements are established which, if properly implemented, provide adequate assurance that employees, the public, and the environment are protected from adverse consequences.

303.    The "operating contract" required the "operating contractor" to ensure that administrative and engineering controls to prevent and mitigate hazards are proper and adequate to the work being performed and associated hazards and the work and controls are designed to "reduce or eliminate the hazards and to prevent accidents and unplanned releases and exposures.

### The Plaintiff's Awareness of the Specific Cause of Injury Secondary to BNL Toxic Chemical Exposures

304.    MARINO was unaware that TCE exposure at BNL was possibly related to his kidney cancer until December 2016.

305.    On November 3, 2016, the National Toxicology Program at the National Institute of Environmental Health Sciences of the National Institutes of Health (NTP/NIEHS/NIH) announced that trichloroethylene was to be classified as a "known human carcinogen" in the U.S. Department of Health & Human Service's (USHHS) 14th Report on Carcinogens.

306.    On December 19, 2016, Dr. Richstone wrote a letter stating, in pertinent part, that MARINO's "use of aerosol spray degreasers containing Trichloroethylene as a part of his daily work routine has also been proven to contain carcinogenetic materials leading in the cause of kidney cancer". Dr. Richstone further stated that, in his opinion, MARINO's "consistent exposures to such chemicals are a definite contributor if not the cause of his kidney cancer".

307.    On January 12, 2017, a former BNL employee sent a letter to MARINO indicating the following: that he worked as an assistant ITD manager for 42 years: that TCE use was "common place" by over 800 BNL technicians and machine shop workers as a cleaner and degreaser for many things; that every technician at BNL had one or two cans sitting on their desks to use on a variety of cleaning tasks throughout the workday; that TCE was most commonly used by technicians in aerosol cans to clean and degrease; that it was difficult to go anywhere at BNL without exposure through vapor inhalation, direct skin contact, or residue on surfaces.

308.    In or about February 2017, MARINO submitted the foregoing letters by Dr. Richstone and the former BNL assistant ITD manager in support of a claim for benefits under the USDOL EEOICP's Part E for kidney cancer as a result of TCE exposure through the use of solvents at BNL.

309.    On May 9, 2017, the USDOL EEOICP notified MARINO that TCE was a known toxin with a causal link to kidney cancer; however, it erroneously ruled that his "labor category"

purportedly showed no potential connection to TCE exposure at BNL and refused to approve the claim.

310.    MARINO subsequently appealed the decision.

311.    Subsequently, Dr. Richstone issued another letter, dated January 24, 2018, again stating that MARINO's "use of aerosol spray degreasers containing Trichloroethylene as a part of his daily work routine has also been proven to contain carcinogenetic materials leading in the cause of kidney cancer". Dr. Richstone further stated that, in his opinion, MARINO's "consistent exposures to such chemicals are a definite contributor if not the cause of his kidney cancer".

312.    MARINO submitted Dr. Richstone's letter, dated January 24, 2018, to the USDOL EEOICP.

313.    On February 21, 2018, the USDOL EEOICP district office issued a Notice of Recommended Decision to approve MARINO's claim ruling the following in its conclusions of law:

> "The evidence of record establishes that you developed an illness resulting from exposure to a toxic substance under Part E of EEOICPA. It is at least as likely as not that the exposure to toxic substances was related to employment at a DOE facility and that exposure was at least as likely as not a significant factor in aggravating, contributing, or causing the illness of kidney cancer in accordance with Part E of the EEOICPA."

314.    On or about March 1, 2018, Dr. Richstone diagnosed MARINO with left chronic kidney disease (stage III).

315.   Dr. Richstone stated in a letter, dated March 9, 2018, that MARINO's chronic kidney disease was "as a result of his 2009 nephrectomy". The CKD stage III was "compromising renal function by 45%"; there was "no chance of reversal" and the "possibility of further decline in functionality". Dr. Richstone further stated that MARINO was deemed "no longer ….. able to maintain steady employment" due to "risk of exposure" to illness that could "rapidly increase his decline in kidney function" and "increase the risk of renal failure to his remaining kidney".

316.   On April 6, 2018, the USDOL EEOICP Final Adjudication Branch issued a Notice of Final Decision approving MARINO's claim ruling the following:

> "FINDINGS OF FACT
>
> On August 31, 2010, you filed a claim for benefits under EEOICPA based on the condition of kidney cancer.
>
> You were employed at Brookhaven National Laboratory in Upton, NY, from September 20, 1999 to December 31, 2000.
>
> You were diagnosed with right kidney cancer on March 10, 2009.
>
> The medical evidence of record establishes that your exposure to toxic substances at the Brookhaven National Laboratory was at least as likely as not a significant factor in aggravating, contributing, or causing the illness of kidney cancer.
>
> CONCLUSIONS OF LAW
>
> Based on the medical evidence showing that you were diagnosed with kidney cancer, and the medical opinion of Dr. Lee Richstone that your kidney cancer is directly related to your occupational exposures at the Brookhaven National Laboratory, your kidney cancer isdetermined to have been contracted through the exposure to a toxic substance at a DOE facility."

317.    Subsequent to Dr. Richstone's letters dated December 19, 2016, January 24, 2018, and March 9, 2018, the former BNL assistant ITD manager's letter, the USDOL EEOICP Notice of Recommended Decision, dated February 21, 2018, and Notice of Final Decision, dated April 6, 2018, MARINO remained uncertain about what, if any, specific *TCE products* he used at BNL. In other words, MARINO was uncertain about the (1) identification of the specific TCE products personally used; and (2) identification of specific TCE product manufacturers.

318.    On or about August 6, 2018, MARINO was shown the BNL Site Exposure Matrices for Buildings 515, 479, 462 and Trichloroethylene.

319.    It was not until August 6, 2018, that MARINO could identify the specific cleaning solvent products that he used at BNL with TCE as the active ingredient and identify the TCE product manufacturers (i.e., ZEP's Power-Solv II and Aero-Solv II, and DOW's Triclene, Tri-Clene and Tri-Clean) and identify the alleged specific cause of his right kidney cancer and left chronic kidney disease (stage III).

320.    Based on the review of the foregoing materials, MARINO became aware of the specific TCE products and the parties responsible for the TCE exposures that caused, contributed to or were substantial factors resulting in his right kidney cancer and left chronic kidney disease (stage III) on August 6, 2018.

321.    MARINO was advised that he had right kidney cancer on or about March 10, 2009, and discovered that he had left chronic kidney disease (stage III) on March 1, 2018; those conditions are considered to be the result of a continuum of renal toxicity secondary to TCE exposure.

322.    The technical, scientific or medical knowledge and information sufficient to ascertain the specific cause of MARINO's injuries (i.e., right kidney cancer and left chronic kidney disease (stage III)) sufficient to file a lawsuit had not been discovered, identified or determined prior to August 6, 2018.

323.    While MARINO discovered that he had right kidney cancer on or about March 10, 2009; the U.S. government had not yet officially recognized TCE as a known human carcinogen etiologic for renal cancer and toxic renal injury by including TCE in the 14th Report on Carcinogens.

324.    It was not until November 3, 2016, that the U.S. Department of Health & Human Services NTP/NIEHS/NIH published the 14th Report on Carcinogens officially classifying TCE as a known human carcinogen and identifying TCE as a cause of kidney cancer and toxic renal injury.

325.    While MARINO was aware that his use of TCE cleaning solvents caused or contributed to his kidney cancer when Dr. Richstone wrote his letter on December 19, 2016, MARINO was unable to identify the specific TCE products that he used at BNL or identify the specific

manufacturers of those TCE products until August 6, 2018, when he was given the Site Exposure Matrices.

326.    It was not until August 6, 2018, that MARINO recognized that he used ZEP's Power-Solv II and Aero-Solv II, and DOW's Triclene, Tri-Clene and Tri-Clean, realized that those products contained TCE and that direct inhalation and trans-dermal contact was the primary route of his TCE exposure.

327.    Thus, it was not until August 6, 2018, that MARINO could specifically identify "the cause of his injury" or the parties responsible for those injuries.

328.    The Site Exposure Matrices enabled MARINO to obtain the technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury on August 6, 2018.

329.    Prior to August 6, 2018, MARINO could not possibly determine and establish that his right kidney cancer and left chronic kidney disease (stage III) were caused by his use of ZEP's Power-Solv II and Aero-Solv II, and DOW's Triclene, Tri-Clene and Tri-Clean while working at BNL during the period 1999 – 2000.

330.    The earliest that MARINO could have been generally aware and prove that TCE cleaning solvents used at BNL was the cause of his right kidney cancer was on December 19, 2016.

331.    No BNL worker could possibly know or prove that TCE exposures generally could be a viable explanation for their kidney cancer or disease until the publication of the 14th Report on Carcinogens on November 3, 2016.

332.    Subsequent to August 6, 2018, MARINO was shown numerous reports, records and documents revealing the pervasive environmental pollution and contamination of BNL by TCE, PCE, VOCs, TVOCs, toxic heavy metals, benzenes and other toxic chemicals in the buildings, structures, facilities, soils, surface water, groundwater, and drinking water supplies.

333.    It was not until sometime after August 6, 2018, that MARINO could identify other toxic exposures resulting from BNL's pervasive environmental pollution and contamination by TCE, PCE, VOCs, TVOCs, toxic heavy metals, benzenes and other toxic chemicals.

334.    Based on the review of the foregoing materials, MARINO became aware of other toxic exposures resulting from BNL's environmental pollution and toxic contamination that contributed to or were substantial factors resulting in his injuries, illnesses, harm, losses and damages sometime after August 6, 2018.

**FIRST CAUSE OF ACTION:**
**NEGLIGENCE**

335.    Plaintiff JOSEPH MARINO repeats, re-alleges and reiterates each and every allegation contained in paragraphs numbered "1" through "334" of the Complaint and incorporates them by reference as if fully repeated, realleged and reiterated in this paragraph.

336.    Pursuant to its contractual responsibilities as the BNL "operating contractor", AUI and BSA owed duties to all employees, contractors, subcontractors, visitors, occupants, future occupants and other people at and within the vicinity of the site, including JOSEPH MARINO, to use reasonable care to safely operate, control, manage, supervise, direct, administer, oversee and conduct all research, work, operations, activities, performance, services and functions at the laboratory and on the site.

337.    Pursuant to its contractual responsibilities as the BNL "operating contractor", AUI and BSA owed duties to all employees, contractors, subcontractors, visitors, occupants, future occupants and other people at and within the vicinity of the site, including JOSEPH MARINO, to use reasonable care to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and site from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzene, other toxic chemicals and radioactive isotopes; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and hazards, dangers and risks to human health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes; and (4) protect the

health, safety and welfare of employees, contractors, visitors, occupants, future occupants and the general public at or in the vicinity of the site against the hazards, dangers, and risks presented by environmental pollution, toxic contamination, toxic substances, dangerous, hazardous, and ultra-hazardous activities and contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes at the laboratory and on the site.

338.    Pursuant to its contractual responsibilities as the BNL "operating contractor", AUI and BSA owed duties to use reasonable care to ensure safety at the site and protect the safety of those people at, on or in the vicinity of the site.

339.    Pursuant to its contractual responsibilities as the BNL "operating contractor", AUI and BSA owed duties to all employees, contractors, subcontractors, visitors, occupants, future occupants and other people at and within the vicinity of the site, including JOSEPH MARINO, to use reasonable care to operate, control, direct, manage, supervise, monitor, oversee, conduct, and regulate the laboratory's activities, research, business, performance, services, functions, facilities, equipment, supplies, assets, and property in a safe manner to protect the health, safety and welfare of those persons at, on and in the vicinity of the site.

340.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in providing a safe place to work at the site.

341.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, including JOSEPH MARINO, to use reasonable care in providing safe working conditions at the site.

342.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in supplying workers with TCE products to use in the course of their work duties and responsibilities.

343.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately protecting workers from the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

344.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately warning workers about the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

345.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately instructing, educating and informing workers about the hazards, dangers and risks of TCE to human health, safety and welfare.

346.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in providing proper and adequate protective measures to prevent, avoid and/or limit exposures to the hazards, dangers and risks to human health, safety and welfare of TCE cleaning solvents.

347.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing instructions for the safe uses of TCE cleaning solvents.

348.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing the manufacturers' warnings about TCE hazards, dangers, and risks to human health, safety and welfare.

349.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing the manufacturers' instructions about preventing, avoiding and/or limiting TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

350.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing the manufacturers' instructions about safe uses of TCE cleaning solvents.

351.    AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing for the safe discharge, release, discarding and disposal of TCE.

352.    DOW and ZEP owed a duty of reasonable care to purchasers and users of its TCE products, including JOSEPH MARINO, to manufacture, market, distribute, sell and place into the stream of commerce products that could be used in a reasonably safe manner.

353.    DOW and ZEP owed a duty of reasonable care to purchasers and users of its TCE products, including JOSEPH MARINO, to manufacture, market, distribute, sell and place into the stream of commerce products that did not subject users to an unreasonable risk of harm.

354.    DOW and ZEP owed a duty of reasonable care to purchasers and users of its TCE products, including JOSEPH MARINO, to properly and adequately provide warnings to users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare.

355.    DOW and ZEP owed a duty of reasonable care to purchasers and users of its TCE products, including JOSEPH MARINO, to properly and adequately instruct, educate and inform users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare.

356.   DOW and ZEP owed a duty of reasonable care to purchasers and users of its TCE products, including JOSEPH MARINO, to provide instructions for the proper and safe use of these products.

357.   AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in supplying workers with PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to use in the course of their work duties and responsibilities.

358.   AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately protecting workers from the inherent hazards, dangers and risks of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to human health, safety and welfare.

359.   AUI and BSA owed duties to all BNL employees, contractors, subcontractors, and workers, including JOSEPH MARINO, to use reasonable care in properly and adequately providing for the safe use, handling, storage, discharge, release, discarding and disposal of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals.

360.   AUI and BSA breached and violated their duties to safely operate, control, manage, supervise, direct, administer, oversee and conduct all research, work, operations, activities, performance, services and functions at the laboratory and on the site to the detriment of

JOSEPH MARINO and many other BNL workers.

361.    AUI and BSA breached and violated their duties to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and site from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzene, other toxic chemicals and radioactive isotopes; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and hazards, dangers and risks to health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzene, other toxic chemicals and radioactive isotopes; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and hazards, dangers and risks to human health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes; and (4) protect the health, safety and welfare of employees, contractors, visitors, occupants, future occupants and the general public at or in the vicinity of the site against the hazards, dangers, and risks presented by environmental pollution, toxic contamination, toxic substances, dangerous, hazardous, and ultra-hazardous activities and contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes at the laboratory and on the site to the detriment of JOSEPH MARINO and many other BNL workers.

362.    AUI and BSA breached and violated their duties to ensure safety at the site and protect

83

the safety of JOSEPH MARINO and many other BNL workers.

363.    AUI and BSA breached and violated their duties to provide JOSEPH MARINO and many other BNL workers with a safe place to work at the site.

364.    AUI and BSA breached and violated their duties to provide JOSEPH MARINO and many other BNL workers with safe working conditions at the site.

365.    AUI and BSA breached and violated their duties to safely supply JOSEPH MARINO and many other BNL workers with TCE products to use in the course of their work duties and responsibilities.

366.    AUI and BSA breached and violated their duties to properly and adequately protect JOSEPH MARINO and many other BNL workers from the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

367.    AUI and BSA breached and violated their duties to properly and adequately warn JOSEPH MARINO and many other BNL workers about the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

368.    AUI and BSA breached and violated their duties to properly and adequately instruct, educate and inform JOSEPH MARINO and many other BNL workers about the hazards, dangers and risks of TCE to human health, safety and welfare.

369.     AUI and BSA breached and violated their duties to properly and adequately provide JOSEPH MARINO and many other BNL workers with protective measures to prevent, avoid and/or limit exposures to the hazards, dangers and risks to human health, safety and welfare of TCE cleaning solvents.

370.     AUI and BSA breached and violated their duties to properly and adequately provide JOSEPH MARINO and many other BNL workers instructions for the safe uses of TCE cleaning solvents.

371.     AUI and BSA breached and violated their duties to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' warnings about TCE hazards, dangers, and risks to human health, safety and welfare.

372.     AUI and BSA breached and violated their duties to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' instructions about preventing, avoiding and/or limiting TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

373.     AUI and BSA breached and violated their duties to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' instructions about safe uses of TCE cleaning solvents.

374.    AUI and BSA breached and violated their duties to properly and adequately provide for the safe use, handling, storage, discharge, release, discarding and disposal of TCE to the detriment of JOSEPH MARINO and many other BNL workers.

375.    DOW and ZEP breached and violated their duties to manufacture, market, distribute, sell and place into the stream of commerce TCE products that could be used by JOSEPH MARINO and many other BNL workers, in a reasonably safe manner to the detriment of JOSEPH MARINO and many other BNL workers.

376.    DOW and ZEP breached and violated their duties to manufacture, market, distribute, sell and place into the stream of commerce TCE products that did not subject users, including JOSEPH MARINO and many other BNL workers, to an unreasonable risk of harm to the detriment of JOSEPH MARINO and many other BNL workers.

377.    DOW and ZEP breached and violated their duties to properly and adequately provide warnings to users, including JOSEPH MARINO and many other BNL workers, about the inherent hazards, dangers and/or risks of their TCE products to human health, safety and welfare.

378.    DOW and ZEP breached and violated their duties to properly and adequately instruct, educate and inform users, including JOSEPH MARINO and many other BNL workers, about the inherent hazards, dangers and/or risks of their TCE products to human health, safety and welfare.

379.    DOW and ZEP breached and violated their duties to properly and adequately provide instructions for the proper and safe use of their TCE products.

380.    AUI and BSA breached and violated their duties to safely supply workers with PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to use in the course of their work duties and responsibilities to the detriment of JOSEPH MARINO and many other BNL workers.

381.    AUI and BSA breached and violated their duties to properly and adequately protect JOSEPH MARINO and many other BNL workers from the inherent hazards, dangers and risks of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to human health, safety and welfare.

382.    AUI and BSA breached and violated their duties to properly and adequately provide for the safe use, handling, storage, discharge, release, discarding and disposal of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to the detriment of JOSEPH MARINO and many other BNL workers.

383.    AUI and BSA negligently failed to safely operate, control, manage, supervise, direct, administer, oversee and conduct all research, work, operations, activities, performance, services and functions at the laboratory and on the site to the detriment of JOSEPH MARINO and many other BNL workers.

384.   AUI and BSA negligently failed to (1) prevent, protect and conserve the surrounding environment and environmental resources at the laboratory and site from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzene, other toxic chemicals and radioactive isotopes; (2) formulate, develop, issue, and implement sufficient safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination, and hazards, dangers and risks to health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzene, other toxic chemicals and radioactive isotopes; (3) ensure compliance with safety protocols, rules, regulations, standards, guidelines and measures to protect the site and those people on or near the site against environmental pollution, toxic contamination and hazards, dangers and risks to human health, safety and welfare from contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes; and (4) protect the health, safety and welfare of employees, contractors, visitors, occupants, future occupants and the general public at or in the vicinity of the site against the hazards, dangers, and risks presented by environmental pollution, toxic contamination, toxic substances, dangerous, hazardous, and ultra-hazardous activities and contamination with TCE, PCE, VOC, TVOC, toxic heavy metals, benzenes, other toxic chemicals and radioactive isotopes at the laboratory and on the site to the detriment of JOSEPH MARINO and many other BNL workers.

385.   AUI and BSA negligently failed to ensure safety at the site and protect the safety of JOSEPH MARINO and many other BNL workers.

386.    AUI and BSA negligently failed to provide JOSEPH MARINO and many other BNL workers with a safe place to work at the site.

387.    AUI and BSA negligently failed to provide JOSEPH MARINO and many other BNL workers with safe working conditions at the site.

388.    AUI and BSA negligently failed to safely supply JOSEPH MARINO and many other BNL workers with TCE products to use in the course of their work duties and responsibilities.

389.    AUI and BSA negligently failed to properly and adequately protect JOSEPH MARINO and many other BNL workers from the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

390.    AUI and BSA negligently failed to properly and adequately warn JOSEPH MARINO and many other BNL workers about the inherent hazards, dangers and risks of TCE to human health, safety and welfare.

391.    AUI and BSA negligently failed to properly and adequately instruct, educate and inform JOSEPH MARINO and many other BNL workers about the hazards, dangers and risks of TCE to human health, safety and welfare.

392.   AUI and BSA negligently failed to properly and adequately provide JOSEPH MARINO and many other BNL workers with protective measures to prevent, avoid and/or limit exposures to the hazards, dangers and risks to human health, safety and welfare of TCE cleaning solvents.

393.   AUI and BSA negligently failed to properly and adequately provide JOSEPH MARINO and many other BNL workers instructions for the safe uses of TCE cleaning solvents.

394.   AUI and BSA negligently failed to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' warnings about TCE hazards, dangers, and risks to human health, safety and welfare.

395.   AUI and BSA negligently failed to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' instructions about preventing, avoiding and/or limiting TCE hazards, dangers, and risks to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness.

396.   AUI and BSA negligently failed to properly and adequately provide JOSEPH MARINO and many other BNL workers with the manufacturers' instructions about safe uses of TCE cleaning solvents.

397.   AUI and BSA negligently failed to properly and adequately provide for the safe use, handling, storage, discharge, release, discarding and disposal of TCE to the detriment of

JOSEPH MARINO and many other BNL workers.

398.    DOW and ZEP negligently failed to manufacture, market, distribute, sell and place into the stream of commerce TCE products that could be used by JOSEPH MARINO and many other BNL workers, in a reasonably safe manner to the detriment of JOSEPH MARINO and many other BNL workers.

399.    DOW and ZEP negligently failed to manufacture, market, distribute, sell and place into the stream of commerce TCE products that did not subject users, including JOSEPH MARINO and many other BNL workers, to an unreasonable risk of harm to the detriment of JOSEPH MARINO and many other BNL workers.

400.    DOW and ZEP negligently failed to properly and adequately provide warnings to users, including JOSEPH MARINO and many other BNL workers, about the inherent hazards, dangers and/or risks of their TCE products to human health, safety and welfare.

401.    DOW and ZEP negligently failed to properly and adequately instruct, educate and inform users, including JOSEPH MARINO and many other BNL workers, about the inherent hazards, dangers and/or risks of their TCE products to human health, safety and welfare.

402.    DOW and ZEP negligently failed to properly and adequately provide instructions for the proper and safe use of their TCE products.

403.     AUI and BSA negligently failed to safely supply workers with PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to use in the course of their work duties and responsibilities to the detriment of JOSEPH MARINO and many other BNL workers.

404.     AUI and BSA negligently failed to properly and adequately protect JOSEPH MARINO and many other BNL workers from the inherent hazards, dangers and risks of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to human health, safety and welfare.

405.     AUI and BSA negligently failed to properly and adequately provide for the safe use, handling, storage, discharge, release, discarding and disposal of PCE, VOC, TVOC, toxic heavy metals, benzene, and other toxic chemicals to the detriment of JOSEPH MARINO and many other BNL workers.

406.     The foregoing negligence of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting JOSEPH MARINO's cancer, toxicity, injury, illness, harm, losses and damages.

407.     The foregoing negligence of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer, left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential medical sequelae, scarring, disfigurement, recurrence risks, worsened

prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

408.    The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI, BSA, DOW and ZEP and were in no way caused and/or contributed to by Mr. MARINO.

409.    As a result of the negligence of AUI, BSA, DOW and ZEP, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

410.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI, BSA, DOW and ZEP for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

411.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

## SECOND CAUSE OF ACTION:
## STRICT PRODUCTS LIABILITY FOR
## DANGEROUSLY DEFECTIVE PRODUCTS

412.    Plaintiff JOSEPH MARINO repeats, realleges and reiterates each and every allegation contained in paragraphs numbered "1" through "411" of the Complaint as if fully repeated, realleged and reiterated in this paragraph.

413.    AUI, BSA, DOW and ZEP distributed and supplied the vast majority of the TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) used by workers at BNL including JOSEPH MARINO.

414.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to manufacture, market, distribute, sell and/or place into the stream of commerce products that were reasonably safe.

415.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to manufacture, market, distribute, sell and/or place into the stream of commerce products that did not subject users to an unreasonable risk of harm.

416.    AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and

other BNL workers to manufacture, market, distribute, sell and/or place into the stream of commerce products that were reasonably safe.

417.    AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to manufacture, market, distribute, sell and/or place into the stream of commerce products that did not subject users to an unreasonable risk of harm.

418.    AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that were not reasonably safe to the detriment of JOSEPH MARINO and other BNL workers.

419.    AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that subjected users to an unreasonable risk of harm to the detriment of JOSEPH MARINO and other BNL workers.

420.    The TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) distributed and supplied by AUI, BSA, DOW and ZEP were human carcinogens, nephrotoxic,

hepatotoxic, toxic to humans health in many ways, and ultra-hazardous, hazardous and dangerous to human health, safety and welfare.

421.    JOSEPH MARINO and many other workers at BNL sustained TCE exposures that were carcinogenic, nephrotoxic, hepatotoxic, toxic, and/or ultra-hazardous, hazardous and/or dangerous to their health, safety and welfare.

422.    The foregoing hazards, dangers and risks to the human health, safety and welfare of JOSEPH MARINO and many other workers from the TCE products manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce by AUI, BSA, DOW and ZEP at BNL were inherent, latent and not open or obvious.

423.    The foregoing hazards, dangers and risks to human health, safety and welfare of JOSEPH MARINO and many other workers from the use and/or misuse of the TCE products manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce by AUI, BSA, DOW and ZEP at BNL was foreseeable.

424.    AUI, BSA, DOW and ZEP are strictly liable for the manufacture, market, distribute, sell and/or place into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that were dangerously defective, not reasonably safe and presented an unreasonable risk of harm.

425.   The foregoing conduct of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting JOSEPH MARINO's cancer, toxicity, injury, illness, harm, losses and damages.

426.   The foregoing conduct of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer, left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential medical sequelae, scarring, disfigurement, recurrence risks, worsened prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

427.   The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI, BSA, DOW and ZEP and were in no way caused and/or contributed to by Mr. MARINO.

428.   As a result of the foregoing conduct of AUI, BSA, DOW and ZEP, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

429.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI, BSA, DOW and ZEP for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

430.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

### THIRD CAUSE OF ACTION: STRICT PRODUCTS LIABILITY FOR FAILURE TO PROVIDE ADEQUATE WARNINGS & USE INSTRUCTIONS

431.    Plaintiff JOSEPH MARINO repeats, realleges and reiterates each and every allegation contained in paragraphs numbered "1" through "430" of the Complaint as if fully repeated, realleged and reiterated in this paragraph.

432.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to properly and adequately provide warnings to users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare.

433.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to properly and adequately instruct, educate and inform users about the inherent hazards, dangers and/or risks

of these products to human health, safety and welfare.

434.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to provide instructions for the proper and safe use of these products.

435.    AUI, BSA, DOW and ZEP owed a duty to users of its TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form), including JOSEPH MARINO, to properly and adequately provide instructions for the safe discharge, release, discard and disposal of these products.

436.    AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to properly and adequately provide warnings to users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare.

437.    AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to properly and adequately instruct, educate and inform users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare.

438.  AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to provide instructions for the proper and safe use of these products

439.  AUI, BSA, DOW and ZEP breached and violated their duties to JOSEPH MARINO and other BNL workers to properly and adequately provide instructions for the safe discharge, release, discard and disposal of these products.

440.  AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that did not properly and adequately provide warnings to users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare to the detriment of JOSEPH MARINO and other BNL workers.

441.  AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that did not properly and adequately instruct, educate and inform users about the inherent hazards, dangers and/or risks of these products to human health, safety and welfare to the detriment of JOSEPH MARINO and other BNL workers.

442.  AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II,

DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that did not provide instructions for the proper and safe use of these products

443.    AUI, BSA, DOW and ZEP manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) that did not properly and adequately provide instructions for the safe discharge, release, discard and disposal of these products to the detriment of JOSEPH MARINO and other BNL workers.

444.    The TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) distributed and supplied by AUI, BSA, DOW and ZEP were human carcinogens, nephrotoxic, hepatotoxic, toxic to humans health in many ways, and ultra-hazardous, hazardous and dangerous to human health, safety and welfare.

445.    JOSEPH MARINO and many other workers at BNL sustained TCE exposures that were carcinogenic, nephrotoxic, hepatotoxic, toxic, and/or ultra-hazardous, hazardous and/or dangerous to their health, safety and welfare.

446.    The foregoing hazards, dangers and risks to the human health, safety and welfare of JOSEPH MARINO and many other workers from the TCE products manufactured,

marketed, distributed, sold, supplied and/or placed into the stream of commerce by AUI, BSA, DOW and ZEP at BNL were inherent, latent and not open or obvious.

447.    The foregoing hazards, dangers and risks to human health, safety and welfare of JOSEPH MARINO and many other workers from the use and/or misuse of the TCE products manufactured, marketed, distributed, sold, supplied and/or placed into the stream of commerce by AUI, BSA, DOW and ZEP at BNL was foreseeable.

448.    AUI, BSA, DOW and ZEP are strictly liable for the manufacture, market, distribute, sell and/or place into the stream of commerce TCE products (ZEP's Power-Solv II and Aero-Solv II, DOW's Triclene, Tri-Clene and Tri-Clean and similar TCE products in aerosol, liquid and liquid bulk form) without the foregoing proper and adequate warnings and instructions about the hazards, dangers and risks to human health, safety and welfare presented by these dangerously defective and inherently ultra-hazardous, hazardous and dangerous nature of these products.

449.    The foregoing conduct of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting JOSEPH MARINO's cancer, toxicity, injury, illness, harm, losses and damages.

450.    The foregoing conduct of AUI, BSA, DOW and ZEP caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer and left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished

kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential medical sequelae, scarring, disfigurement, recurrence risks, worsened prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

451.    The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI, BSA, DOW and ZEP and were in no way caused and/or contributed to by Mr. MARINO.

452.    As a result of the foregoing conduct of AUI, BSA, DOW and ZEP, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

453.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI, BSA, DOW and ZEP for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

454.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

## FOURTH CAUSE OF ACTION:
## STRICT LIABILITY FOR
## ABNORMALLY DANGEROUS ACTIVITIES

455.    Plaintiff JOSEPH MARINO repeats, realleges and reiterates each and every allegation contained in paragraphs numbered "1" through "454" of the Complaint as if fully repeated, realleged and reiterated in this paragraph.

456.    AUI and BSA engaged in BNL operational and disposal practices with TCE, PCE, VOC, TVOC, toxic heavy metals, and other toxic chemicals and substances and/or other ultra-hazardous toxins that were negligent, reckless, and/or intentional and constituted an ultra-hazardous or abnormally dangerous activity for which they are strictly liable.

457.    AUI and BSA negligently used, misused, handled, stored, discharged, released, discarded and disposed of TCE, PCE, VOC, TVOC, toxic heavy metals, and other toxic chemicals and substances and/or other ultra-hazardous toxins at BNL that were carcinogenic and/or ultra-hazardous, hazardous and dangerous to human health, safety and welfare.

458.    The foregoing ultra-hazardous or abnormally dangerous activity and conduct of AUI and BSA resulted in the pervasive environmental pollution and toxic contamination of BNL's buildings, structures, facilities, soils, surface waters, groundwater, drinking water supplies, land, ambient indoor air and site.

459.    The foregoing ultra-hazardous or abnormally dangerous activity and conduct of AUI and BSA caused, created and resulted in the foreseeable risks of personal injury, illness, harm

and/or death to those working at BNL including BNL employees, contractors, subcontractors, visitors and other people at, on or in the vicinity of the site, including JOSEPH MARINO and many other BNL workers.

460.    The foregoing ultra-hazardous and abnormally dangerous activities and conduct of AUI and BSA at BNL caused and created a high degree of risk to human health, safety and welfare.

461. The foregoing ultra-hazardous and abnormally dangerous activities and conduct of AUI and BSA at BNL caused and created high risks of harm that could not otherwise be eliminated without closure of the laboratory.

462.    The ultra-hazardous and abnormally dangerous activities by AUI and BSA at BNL were not a matter of common usage.

463. The foregoing conduct of AUI and BSA at BNL in a densely populated location presented such a high degree of hazards, dangers and risks to human health, safety and welfare that outweighed its value to the community.

464. The foregoing ultra-hazardous and abnormally dangerous activities and conduct of AUI and BSA at BNL were inappropriate to the densely populated location.

465.    AUI and BSA allowed and/or caused these ultra-hazardous and abnormally dangerous activities to exist at BNL during the period 1947 – 2006 encompassing the period of time that JOSEPH MARINO worked there.

466.    The harzards, dangers and risks to JOSEPH MARINO and many other BNL workers presented by these ultra-hazardous and abnormally dangerous activities outweighed any value associated with the same.

467.    AUI and BSA are strictly liable to JOSEPH MARINO for any injuries, illnesses, harm and losses caused by these ultra-hazardous and abnormally dangerous activities at BNL.

468.    The foregoing conduct of AUI and BSA caused, contributed to and were substantial factors resulting JOSEPH MARINO's cancer, toxicity, injury, illness, harm, losses and damages.

469.    The foregoing conduct of AUI and BSA caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer and left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential medical sequelae, scarring, disfigurement, recurrence risks, worsened prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

470.    The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI and BSA and were in no way caused and/or contributed to by Mr. MARINO.

471.    As a result of the foregoing conduct of AUI and BSA, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

472.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI and BSA for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

473.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

**FIFTH CAUSE OF ACTION:**
**GROSS NEGLIGENCE**

474.    Plaintiff JOSEPH MARINO repeats, realleges and reiterates each and every allegation contained in paragraphs numbered "1" through "473" of the Complaint as if fully repeated, realleged and reiterated in this paragraph.

475.    The foregoing conduct of AUI and BSA pertaining to BNL operational and disposal practices for TCE, PCE, VOC, TVOC, toxic heavy metals, and other toxic chemicals and

substances and/or other ultra-hazardous toxins were grossly negligent, reckless, and/or intentional.

476.    The foregoing conduct of AUI and BSA pertaining to BNL operational and disposal practices for TCE, PCE, VOC, TVOC, toxic heavy metals, and other toxic chemicals and substances and/or other ultra-hazardous toxins

477.    The foregoing conduct of AUI and BSA was undertaken in reckless disregard of the health, safety and welfare of JOSEPH MARINO and many other BNL workers.

478.    The foregoing conduct of AUI and BSA was undertaken with gross indifference to the health, safety and welfare of JOSEPH MARINO and many other BNL workers.

479.    The foregoing conduct of AUI and BSA was undertaken with the knowledge, awareness and/or reason to know that it would present an unreasonable risk of injury, illness, harm, loss and/or death to JOSEPH MARINO and many other BNL workers.

480.    The foregoing conduct of AUI and BSA knowingly, willfully and intentionally created an unreasonable risk of physical harm to JOSEPH MARINO and many other BNL workers.

481.    The foregoing conduct of AUI and BSA resulted in the pervasive environmental pollution and toxic contamination of BNL's buildings, structures, facilities, soils, surface waters, groundwater, drinking water supplies, land, ambient indoor air and site.

482.    The foregoing grossly negligent conduct of AUI and BSA caused, created and resulted in the foreseeable risks of personal injury, illness, harm and/or death to those working at BNL including BNL employees, contractors, subcontractors, visitors and other people at, on or in the vicinity of the site, including JOSEPH MARINO and many other BNL workers.

483.    The foregoing conduct of AUI and BSA caused, contributed to and were substantial factors resulting JOSEPH MARINO's cancer, toxicity, injury, illness, harm, losses and damages.

484.    The foregoing conduct of AUI and BSA caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer and left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential medical sequelae, scarring, disfigurement, recurrence risks, worsened prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

485.    The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI and BSA and were in no way caused and/or contributed to by Mr. MARINO.

486.    As a result of the foregoing conduct of AUI and BSA, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

487.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI and BSA for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

488.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

### SIXTH CAUSE OF ACTION:
### FRAUDULENT CONCEALMENT

489.    Plaintiff JOSEPH MARINO repeats, realleges and reiterates each and every allegation contained in paragraphs numbered "1" through "488" of the Complaint as if fully repeated, realleged and reiterated in this paragraph.

490.    AUI and BSA fraudulently concealed the hazards, dangers, and risks of TCE use, contamination and exposure to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness, from BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, during the period 1947 – 2006 if not later.

491.    AUI's and BSA's fraudulent concealment of TCE health risks was motivated by the

"operating contractor's" goal of ensuring the renewal of the lucrative "operating contract" with USDOE, maintaining a sufficient local workforce to support the scientific research, work, operations, activities, performance, services and functions at the laboratory and on the site, and implementing a "science over safety" attitude and mentality at the BNL.

492.    AUI and BSA fraudulently concealed the hazards, dangers, and risks of toxic chemical use, contamination and exposure to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness, from BNL employees, contractors and/or subcontractors during the period 1947 – 2006 if not later.

493.    AUI and BSA fraudulently concealed the hazards, dangers, and risks of radiological contamination and exposure to human health, safety and welfare, including the risks of carcinogenicity, toxicity, injury and illness, from BNL employees, contractors and/or subcontractors, including JOSEPH MARINO, during the period 1947 – 2006 if not later.

494.    The foregoing fraudulent concealment of AUI and BSA caused, contributed to and were substantial factors resulting in cancer, toxicity, injury, illness and harm to JOSEPH MARINO.

495.    The foregoing conduct of AUI and BSA caused, contributed to and were substantial factors resulting in JOSEPH MARINO's right kidney cancer and left chronic kidney disease (stage III), kidney failure risks, right laparoscopic nephrectomy, diminished kidney function, renal impairment, conscious pain and suffering, grave injury, loss of an organ, consequential

medical sequelae, scarring, disfigurement, recurrence risks, worsened prognosis, decreased life expectancy, distress, anguish, worry, anxiety, medical monitoring, past and future medical expenses, past and future income loss, past and future occupational disabilities, limitations in activities of daily living, and loss of enjoyment of life.

496.    The injuries, illnesses, harm, losses and damages sustained by JOSEPH MARINO were caused solely and wholly by virtue of the foregoing acts, omissions and conduct of AUI and BSA and were in no way caused and/or contributed to by Mr. MARINO.

497.    As a result of the foregoing conduct of AUI and BSA, JOSEPH MARINO has been damaged in an amount in excess of the jurisdiction of all lower courts in the State of New York and is entitled to compensatory and punitive damages that exceed the jurisdictional limits of all lower courts.

498.    By reason of the foregoing, plaintiff JOSEPH MARINO is entitled to compensatory and punitive damages from defendants AUI and BSA for his non-economic and economic injuries that exceed the jurisdictional limits of all lower courts.

499.    By reason of the foregoing, plaintiff JOSEPH MARINO demands judgment against defendants in the amount of $25,000,000.00 for compensatory and punitive damages.

**WHEREFORE,** plaintiff JOSEPH MARINO demands judgment awarding compensatory and punitive damages on the first, second, third, fourth, fifth, and sixth causes of

action in the Complaint in an amount totaling $25,000,000.00 and that exceeds the monetary

jurisdictional limits of all lower courts which would otherwise have jurisdiction; and the interest,

costs and disbursements of this action, together with such other and further relief as the court

deems just and proper.

Dated: New York, NY
        October 9, 2019

                                    Yours, etc.,


                                    */S/ J. Lanni*
                                    _____
                                    **JOSEPH LANNI**
                                    THE JACOB FUCHSBERG LAW FIRM, LLP
                                    Attorneys for Plaintiff
                                    JOSEPH MARINO
                                    3 Park Avenue, 37th Floor
                                    New York, New York 10016
                                    Tel.: 212.869.3500
                                    Fax: 212.398.1532
                                    j.lanni@fuchsberg.com

TO:

Ariel Leigh Kapoano, Esq.
John McGahren, Esq.
Morgan, Lewis & Bockius LLP
Attorneys for Defendant
BROOKHAVEN SCIENCE ASSOCIATES, L.L.C.
101 Park Avenue
New York, NY 10178
Tel: 212.309.6000
E-mail: ariel.kapoano@morganlewis.com
jmcgahren@morganlewis.com

Lawrence H. Cooke II, Esq.
Venable LLP
Attorneys for Defendant
ASSOCIATED UNIVERSITIES, INC.
1270 Avenue of the Americas
New York, NY 10020
Tel: 212.307.5500
E-mail: lhcooke@venable.com

Selina M. Ellis, Esq.
Walsh Pizzi O'Reilly Falanga LLP
Attorneys for Defendant
ZEP, INC.
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel: 973.757.1100
E-mail: sellis@walsh.law

Joseph B. Schmit, Esq.
Richard Weingarten, Esq.
Phillips Lytle LLP
Attorneys for Defendant
DOW CHEMICAL, INC.
340 Madison Avenue, 17th Floor
New York, NY 10173-1922
Tel: 212.759.4888
E-mail: jschmit@phillipslytle.com
rweingarten@phillipslytle.com