UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
IN RE: BROOKHAVEN NATIONAL
LABORATORY TRICHLOROETHYLENE ("TCE")
CASES.

**MEMORANDUM OF
DECISION & ORDER**

Civil Action Nos.
19-CV-4839 (GRB)(RML)
19-CV-5475 (GRB)(RML)
19-CV-5729 (GRB)(RML)[1]

-------------------------------------------------------------X

**GARY R. BROWN, United States District Judge**:

The amended complaints in these cases chronicle the alleged history of use and misuse of trichloroethylene ("TCE") at Brookhaven National Laboratory ("BNL" or "the Lab"), and the exposure of these plaintiffs, others and the surrounding environs to this carcinogenic chemical, as well as the resulting injuries.   These allegations, accepted as true for the purposes of the instant motions, provide a disturbing and comprehensive chronicle of dangerous actions and inaction in this regard.

The complaints allege that BNL delegated responsibility for safe handling and mitigation of certain toxic and radioactive substances to its "operating contractors"—Associated Universities, Inc. ("AUI") and Brookhaven Science Associates ("BSA") (collectively, "employer-defendants")—during the relevant periods.  *See, e.g.*, Amended Complaint at ¶¶ 65-76, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19.

---

[1] While motions to consolidate these actions are pending, as discussed herein, these motions, involving numerous pages of similar and, at times, identical filings, are being addressed in a single opinion for the purpose of efficiency. Going forward, counsel are directed to litigate these cases in a consolidated fashion to reduce expense and burden on the parties and the Court.   This directive includes additional cases—*Torre v. Brookhaven Science Associates, et al.*, No. 20-CV-3066 (GRB)(RML), *McGowan v. Brookhaven Science Associates*, No. 20-CV-5729 (GRB)(RML), *Hobson, et al. v. ZEP, Inc.*, No. 20-CV-3055 (GRB)(RML)—which, according to counsel, grow out of the same nucleus of facts.

Specifically, defendant AUI was contracted to serve as the "operating contractor" at BNL from 1947-1998, while defendant BSA filled that role thereafter. *Id.* One of the dangerous substances for which the employer-defendants were responsible was TCE in various forms, which included products manufactured, marketed, sold and shipped by defendants Dow Chemical Co. ("Dow") and Zep, Inc.("Zep") (together with the employer-defendants, "defendants"). *Id.* at ¶¶ 54, 57, 99, 167-70. The complaints charge that the employer-defendants used such substances extensively at BNL despite known toxicity to humans, and that the use of such substances at the Lab "caused severe and pervasive pollution, contamination and exposure risks at the site." *Id.* at ¶¶ 108-110. Extensive TCE use by AUI and BSA included purchasing, delivering, storing, dispensing and deploying the substance in spray cans, bottles, 55-gallon drums and liquid bulk delivery for tank storage. *Id.* at ¶ 118. Particularly relevant here was the employer-defendants' employment of TCE to perform degreasing and cleaning tasks in connection with the Lab's supercomputers, including cleaning head drives and tape spool changes, a function each plaintiff, as employees of the employer-defendants or their contractors, performed 96 times per day during a given eight-hour shift. *Id.* at ¶ 120.

According to the complaints, health risks from TCE had been suspected since the 1950s, and since the 1970s, officials banned its use in connection with food products and pharmaceutical production throughout the world. *Id.* at ¶ 127. By the 1970s, it was considered a probable or suspected human carcinogen. *Id.* at ¶¶ 128-29. Remarkably, in 1978, an article was published *by researchers at BNL* exploring and confirming the toxicity of TCE. *Id.* at ¶ 130. The ubiquity of TCE—along with other contaminants—at the site led to the declaration of BNL as a Superfund Site in 1989. *Id.* at ¶ 131. Notwithstanding this history, it was not until November 3, 2016 that the National Toxicology Program announced that TCE was to be classified as a "known human

carcinogen."  Verified Amended Complaint at ¶ 281, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2.

Nevertheless, continued knowledge about the hazards of TCE led to the Department of Energy implementing a ban in or about 1990, prohibiting its use at any Department of Energy facility, as reported to all U.S. laboratories nationwide.  Amended Complaint at ¶¶ 132-33, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19. In a most troubling allegation, the complaints report that, following the announcement of the DOE ban, AUI managers instructed employees to "stockpile" TCE, describing it as an "optimal choice" for degreasing, cleaning and disinfection throughout the BNL site. *Id.* at ¶ 133.  As a result, TCE products were stockpiled and used at the BNL site for the next sixteen years unabated.  *Id.* at ¶ 134.  AUI and BSA failed to provide workers with adequate protection gear and training in connection with the use of TCE.  Verified Complaint at ¶ 77, *Faine et al v. Zep, Inc. et al*, No. 19-CV-5729 (filed Oct. 10, 2019), ECF No. 1-1.  Moreover, the complaints charge that despite known dangers associated with their products, Dow and Zep failed to properly and adequately warn users, including plaintiffs.  *Id.* at ¶¶ 73-76.

The ardent acquisition and deployment of TCE at the facility led to pervasive pollution and contamination risks, including an identified "TCE Spill Area" in the middle of the Lab campus. Amended Complaint at ¶ 149, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19.   Not only was the Lab site affected, but TCE has also been

identified as part of the infamous groundwater "plumes" around the facility, with contamination uncovered in the Magothy aquifer.[2] *Id.* at ¶¶ 151-161.

While the complaints share a large quantum of common material, certain individual facts bear on the instant motions:

**Plaintiff Marino**

Marino, who has brought suit against BSA, AUI, Zep and Dow, worked as a computer technician at various locations throughout the site. *Id.* at ¶ 52. He was employed by Carlyle Technical Services, L.L.C., and Entex, Inc. and assigned by them to work at BNL from September 20, 1999 to December 31, 2000 as a computer technician repairing, reconfiguring, and servicing computers and supercomputers. *Id.* at ¶¶ 52, 173. During this period, BSA was the Lab's "operating contractor." *Id.* at ¶ 173. During his time at the lab, Marino used TCE in various forms, including two ZEP products and Dow's Triclene. *Id.* at ¶ 176. Marino used TCE "hundreds of times per day over an 8 hour plus shift" as directed by BNL managers and employees. *Id.* at ¶¶ 179-184. On one occasion, faced with a large quantity of TCE deployed by various workers, he was, in apparent attempt at "gallows humor," reassured by a BNL manager that "the radiation in this place will kill you before the fumes from that stuff does." *Id.* at ¶ 188.

In March 2009, Marino was diagnosed with clear cell renal carcinoma, more commonly referred to as kidney cancer, in his right kidney. *Id.* at ¶ 210. His right kidney and cancerous tumor

---

[2] *See Town of Brookhaven v. Sills Rd. Realty LLC*, No. CV 14-2286 GRB, 2014 WL 2854659, at *5 (E.D.N.Y. June 23, 2014) ("These aquifers, the Upper Glacial, Magothy and Lloyd, are more or less geographically coextensive and are layered at different depths underground. The Upper Glacial aquifer, closest to the surface, is the easiest to tap but the least pure and supplies half of Suffolk's drinking water; beneath it is the purer Magothy aquifer, which supplies 100% of the water in Nassau County and the other half of Suffolk's drinking water; and the Lloyd aquifer, the deepest of the three, requires special permits to tap and is considered the water source of last resort.").

were then surgically removed. *Id.* at ¶ 212. Years of subsequent monitoring proved negative for reoccurrence. *Id.* at ¶ 213. In 2015, an MRI revealed left kidney cysts.  It was not, however, until March 1, 2018 that he developed chronic kidney disease in his left kidney. *Id.* at ¶ 214.   Marino's complaint alleges that his physician determined that the kidney cancer and the chronic kidney disease "were part of the same toxic renal injury – TCE exposure." *Id.* at ¶¶ 210-215.

Marino submitted an application for benefits under the EEOICPA in or about February 2017. *Id.* at ¶ 308. The application for benefits included a letter from Plaintiff's physician dated December 19, 2016 indicating that Plaintiff's use of TCE aerosol spray degreasers as part of his daily work routine at BNL was a contributor to his kidney cancer. *Id.* at ¶ 306. The Department of Labor initially denied Plaintiff's claim for benefits, but following Plaintiff's appeal, the EEOICPA Final Adjudication Branch approved his claim for benefits under the program on April 6, 2018. *Id.* at ¶¶ 308-316.

### Plaintiff Yuhas

Yuhas, who has filed an action against AUI, Zep and Dow, worked at BNL as a computer operator, information technology department shift supervisor and telecommunications technician from 1964-2007. Verified Amended Complaint at ¶¶ 159-161, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2.  During most of that period, he was employed by AUI, but after 1998, he became an employee of BSA.  *Id.* at ¶¶ 160-61.  Throughout his 43 years of employment at the Lab, he was required to use TCE cleaning solvents "hundreds of times per day." *Id.* at ¶¶ 165-69.  TCE was used in a "'heavy' and pervasive" manner, often in aerosol form in poorly ventilated spaces and without protective equipment. *Id.* at ¶¶ 171-72, 180.

In 2008, Yuhas was diagnosed with renal cystic disease; subsequent diagnoses included chronic kidney disease, COPD and Crohn's disease, all allegedly resulting from TCE exposure. ¶¶194-96. Yuhas first learned that his injuries were linked to his TCE exposure at BNL— as well as the identity of the products and parties that potentially led to his injuries— on or about October 25, 2018, when he was provided the opportunity to review the BNL Site Exposure Matrices for certain buildings at BNL. *Id.* at ¶¶ 280-99.

### The Faine and Devito Plaintiffs

Plaintiff Ruth Faine worked as a computer operator and technician at BNL from 1966-1995, employed by AUI in its role as the Lab's operating contractor. Verified Complaint at ¶ 29, *Faine et al v. Zep, Inc. et al*, No. 19-CV-5729 (filed Oct. 10, 2019), ECF No. 1-1. As part of her job responsibilities, she was exposed to TCE on a daily basis, using solvents containing the carcinogen at least 96 times during each 8-hour shift. *Id.* In 1995, she was diagnosed with kidney failure, which was treated with dialysis and, later, a kidney transplant. *Id.* at ¶ 30. Her kidney failure later recurred, and she is currently awaiting a second transplant. *Id.* Plaintiff Frank Devito also worked as a computer operator, technician and shift supervisor, and was also employed by AUI from 1962-1994. *Id.* at ¶ 31. He also routinely used TCE products at the direction of AUI managers at least 96 times per day. *Id.* In 1994, Devito was diagnosed with unilateral kidney failure. *Id.* at ¶ 147. Later, he developed bilateral kidney failure and required renal dialysis. *Id.* at ¶ 150.

As with the plaintiffs in the related actions, Faine and Devito allege that the role of TCE as a carcinogen and, more specifically, its link to kidney ailments, remained entirely unknown until November 3, 2016, with the publication of the 14th Report on Carcinogens, "identifying TCE

as a cause of kidney cancer and toxic renal injury." *Id.* at ¶ 202-03, 211; *see also* Amended Complaint at ¶¶ 304-05, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19; Verified Amended Complaint at ¶¶ 287-88, 296, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2.  Further, Faine and Devito allege that they remained unaware "that TCE caused or contributed to their kidney diseases . . . until sometime after September 12, 2018," at which time they were provided with the BNL Matrices discussed above. Verified Complaint at ¶¶ 204-05, *Faine et al v. Zep, Inc. et al*, No. 19-CV-5729 (filed Oct. 10, 2019), ECF No. 1-1.  The Site Exposure Matrices enabled them, for the first time, to identify the places and nature of their exposure to TCE and the causal role of the substance in their diseases, as well as the identities of the subject products, the manufacturers and other potentially relevant parties. *Id.* at ¶¶ 204-213.

On behalf of the aforementioned plaintiffs, the complaints purport to set forth causes of action for negligence, products liability, abnormally dangerous activities, gross negligence and fraudulent concealment.  Additionally, plaintiff Faine's husband, Vernon Faine and plaintiff Devito's wife, Helen Devito, purport to set forth claims for loss of consortium and services. *Id.* at ¶¶ 281-295.

# DISCUSSION

## I.    *Statute of Limitation Questions*

In a barrage of filings, defendants seek dismissal of plaintiffs' claims based, in large measure, on New York State statute of limitations provisions that accrue upon the experience of symptomology by a plaintiff, rather than the plaintiff's discovery of the cause of such injury.  *See, e.g.*, Motion to Dismiss at 7-9, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-

4839 (filed May 22, 2020), ECF No. 57 (citing N.Y. C.P.L.R. § 214-c(2)).  Defendants further

stress that the "unknown cause" exception contained in § 214-c(4) does not save plaintiffs' claims

because the instant cases, at least under this claim accrual framework, generally involve periods

that extend past the maximum time permitted under that exception.  *Id*. at 9-11.  However, despite

plaintiffs' weighty submissions on the matter, defendants give short shrift to the statute of

limitations provisions of CERCLA, found at 42 U.S.C. § 9658, which preempt accrual dates

established in state law statutes of limitations, allowing a plaintiff to file claims within one year

after acquiring knowledge *of the cause* of his or her injury.

The Second Circuit has provided very specific guidance concerning the scope and

applicability of the CERCLA statute of limitations provisions:

> The language of § 9658(a)(1), specifying that the applicable state limitations period
> "shall commence at the federally required commencement date in lieu of" an
> "earlier" date provided by state law, makes it indisputably clear that Congress
> intended, in the cases to which § 9658 applies, that the [federally required
> commencement date, a/k/a the "FRCD"] preempt[s] state law accrual rules if, under
> those rules, accrual would occur earlier than the date on which the cause of the
> personal injury was, or reasonably should have been, known to be the hazardous
> substance. *Accord Union Pacific R.R. Co. v. Reilly Industries, Inc.,* 215 F.3d 830,
> 840 (8th Cir.2000). *Cf. ABB Industrial Systems, Inc. v. Prime Technology, Inc.,* 120
> F.3d 351, 360 n. 5 (2d Cir.1997) ("Under 42 U.S.C. § 9658, if a claim is brought
> under state law for property damages caused by hazardous chemicals and state law
> does not provide a discovery rule, the state statute of limitations cannot begin to
> run until the plaintiff knew or should have known that the damages were caused by
> hazardous chemicals."); *Tucker v. Southern Wood Piedmont Co.,* 28 F.3d 1089,
> 1091 (11th Cir.1994) (same).

*Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 196-97 (2d Cir. 2002).

In response to this provision, which has been clearly construed in binding precedent,

defendants fashion three arguments.  First, defendants contend, in various forms, that plaintiffs do

not and cannot assert a CERCLA claim against defendants for a variety of reasons.  *See, e.g.*,

Motion to Dismiss at 10-15, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22,

2020), ECF No. 36.  This contention is undermined by both the statutory language and applicable case law: a plaintiff need not assert, nor be in a position to assert, a CERCLA claim in order to take advantage of the FRCD.  *Kowalski v. Goodyear Tire & Rubber Co.*, 841 F. Supp. 104, 108 (W.D.N.Y. 1994) ("The plain reading of § 9658 in the context of the mandate which resulted in the SARA amendments suggests that the preemption of a state statute of limitations was passed as an additional remedy, not one confined to actual CERCLA actions.").  *Freier* plainly supports the principle that the FRCD applies to state law claims in absence of an actual or potential CERCLA claim because, in that case, "[p]laintiffs' claims [were] based on state law negligence, strict liability, gross negligence, loss of consortium, and wrongful death."[3]  *In re Pfohl Bros. Landfill Litig.*, 26 F. Supp. 2d 512, 517 (W.D.N.Y. 1998), *vacated on other grounds sub nom. Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176 (2d Cir. 2002).  While other courts have found to the contrary, review of these cases prove unpersuasive. *See, e.g.*, *Becker v. City of Fort Myers*, No. 218CV195FTM38UAM, 2019 WL 2929326, at *4 (M.D. Fla. July 8, 2019) (criticizing the Fourth Circuit's *Blankenship* analysis holding that "plaintiffs must be able to assert a CERCLA claim for § 9658 to apply," noting that "[n]o statutory basis for that interpretation exists. [T]hose phantom requirements . . . cannot square with the statute's plain language which does not include a CERCLA claim or cleanup costs among its requirements" (citations omitted)).

Second, defendants observe that § 9658(a)(1) applies "only if there has been a 'release' into the 'environment' from a 'facility.'" *See, e.g.*, Motion to Dismiss at 15-16, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 36 (quoting *Ruffing ex rel. Calton v Union Carbide Corp.*, 193 Misc. 2d 350, 358 (Sup. Ct. Westchester Cty. Aug. 12, 2002), *aff'd*

---

[3] Not to mention the fact that, in establishing the scope of the CERCLA statute of limitations provisions in *Freier*, the Second Circuit cited as support an Eleventh Circuit case clearly holding that § 9658 applied to claims "brought under state law." *Freier*, 303 F.3d at 197.

*on other grounds sub nom. Ruffing v. Union Carbide Corp.*, 1 A.D.3d 339 (2d Dep't 2003)).

Defendants further assert plaintiffs' claims "are based exclusively on … alleged exposure to . . .

TCE-containing cleaning solvents while working *inside* BNL's buildings, structures, and

facilities" and that such intra-structural releases of toxin fail to satisfy the requisites of the statute.

*Id.* at 16-18.  In support of this construction of federal law, defendants rely upon a decision of a

lower state court and another of a district court outside this Circuit.  *Id.* at 16 (citing *Ruffing* , 193

Misc. 2d at358, 362-64; *Cyker v. Four Seasons Hotels Ltd.*, 1991 WL 1401, at *2 (D. Mass. Jan.

3, 1991)).[4]  To be sure, although the Second Circuit has not yet spoken on the matter, other courts

within this Circuit have also held that § 9658(a)(1) only applies to injuries arising from exposure

to substances released *into the environment*, not exposure *within* an employer's facilities. *See*

*Garner v. NGC Bodily Injury Tr.*, No. 11-CV-6567-CJS, 2012 WL 3560816, at *5 (W.D.N.Y.

Aug. 16, 2012); *Hanley v. Dow Chem. Co.*, No. 96CV0483(LEK/DNH), 1999 WL 33603133

(N.D.N.Y. Mar. 3, 1999); *Wagar v. BASF Corp.*, No. 88-CV-90, 1990 WL 124069, at *3-4

(N.D.N.Y. Aug. 24, 1990); *but see Kowalski*, 841 F. Supp. at 108 ("This court agrees that the

remedial purposes of the statute and the language concerning the release of chemicals into the

environment can be read to include hazardous chemicals carried out of the workplace on

employees' person and clothing which have the potential of causing injuries to those who come in

contact with such employees."). Nevertheless, the circumstances here—as alleged in the

---

[4] For avoidance of doubt, the Second Department did not adopt the lower court's construction of "release" under CERCLA, though defendant Dow did not make this clear in its papers. *Ruffing v. Union Carbide Corp.,* 1 A.D.3d 339, 341, 766 N.Y.S.2d 439, 441 (2003) ("Turning to the merits, the proposed amended complaint essentially alleges that William Pfleging carried out of the workplace and surrounding area hazardous substances on his clothing and within his body to which his wife and daughter in utero were exposed. *Even assuming that 42 USC § 9658 applies so as to render the plaintiffs' claims timely,* the proposed amended complaint fails to state a cognizable cause of action against IBM under either common-law negligence or strict products liability." (emphasis added)).

10

complaints—are drastically different from those at issue in these cases, given the scope of the contamination alleged both inside and outside of the BNL facilities.

Indeed, this argument fundamentally mischaracterizes the allegations of the complaints, which contain numerous allegations of releases of TCE into the environment from the BNL facilities. *See, e.g.*, Amended Complaint at ¶ 55, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19; Verified Amended Complaint at ¶ 42, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2; Verified Complaint at ¶ 80, *Faine et al v. Zep, Inc. et al*, No. 19-CV-5729 (filed Oct. 10, 2019), ECF No. 1-1. Even assuming the Court accepts defendants' legal construction, to prevail, defendants would have to persuade this Court to conclude that plaintiffs' injuries arose solely due to inhalation of TCE released into the ambient air of the facilities as opposed to, by way of example, drinking contaminated water or breathing outside air.  The law, which requires the acceptance of the allegations as true at this early juncture, does not permit such speculative fact finding.

Third, defendants contend that, even if applicable, plaintiffs failed to satisfy the filing requirements of CERCLA as more than a year elapsed from the date plaintiffs "should have known" that TCE caused their allegedly grievous injury.  *See, e.g.*, Motion to Dismiss at 18-20, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 36.  Upon what date "should" plaintiffs have gained such knowledge?  According to defendants, one of three: (1) the release by the U.S. Department of Health and Human Services of the 14th Report on

Carcinogens in November 2016;[5] (2) an EPA proposed ban on TCE in January 2017 and/or (3) "several national publicized media reports regarding TCE's hazardous effects." *Id.* at 19 (citing *In re Burbank Envtl. Litig.*, 42 F.Supp.2d 976, 981 (C.D. Cal. 1998)).   Amalgamating these three events, defendants calculate a date of October 2018 as the expiry of CERCLA's one-year period from when plaintiff Yuhas, for example, "should" have known the cause of his ailments, and noting that the *Yuhas* action was not filed until August 2019.[6] *Id.* at 20.   The Amended Complaint, by contrast, alleges that plaintiff Yuhas did not learn about the products that allegedly caused his illness until he reviewed, with his attorneys, certain technical documents in October 2018.[7] Verified Amended Complaint at ¶¶ 280-84, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2.

The standard to which defendants would hold plaintiffs seems inconsistent with the language of the statute and its construction.   Again, the statutory language and binding precedent from the Second Circuit focuses the inquiry upon "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Freier v. Westinghouse Elec. Corp.*, 303 F.3d at 184 (quoting § 9658(b)(4)(A)).

---

[5] One measure of the length and complexity of this document is provided by an accompanying summary chart entitled "Substances Listed in the Fourteenth Report on Carcinogens," which consists of a five-page, single spaced list of chemicals.  *See* U.S. Dep't of Health & Human Servs., *Substances Listed in the Fourteenth Report on Carcinogens*, National Toxicology Project (Nov. 3, 2016),   https://ntp.niehs.nih.gov/ntp/roc/content/listed_substances_508.pdf. "Trichloroethylene" appears on this list without any of the trade or commercial names of the products containing this substance.

[6] Defendants allege a similar expiry date for the *Faine* action, which was filed in September 2019; as for the *Marino* action, defendants allege that the expiry of the one-year period was December 2017, while it was ultimately filed in July 2019.

[7] Plaintiffs Marino and Faine & Devito allege similar dates of discovery, all within one year of the filing of their respective complaints. *See* Amended Complaint at ¶¶ 319-20, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed Oct. 9, 2019), ECF No. 19; Verified Complaint at ¶¶ 197-98, *Faine et al v. Zep, Inc. et al*, No. 19-CV-5729 (filed Oct. 10, 2019), ECF. 1-1.

Under the scheme set forth by the defendants, plaintiffs, who are suffering from serious medical conditions allegedly arising from decades of unwitting toxic exposures, bear the ongoing burden of reviewing technical government reports, regulatory proposals and nationwide media for any hint that their ailments might have resulted from a previously unidentified carcinogen lurking in the ingredients of commercial products used during their employment.  It would also charge them with the responsibility of recognizing the chemical name of such substances, knowing that such substances were present in commercial products and/or unmarked solvents used during their employment, and seeking these substances out from lists of hundreds or thousands of chemical compounds.  Such obligations would redefine the phrase "reasonably should have known."  More to the point, the *Freier* decision explicitly rejected a determination by the district court that claims were time-barred because "plaintiffs did not show that they could not have obtained [a report demonstrating causation] sooner." *Freier,* 303 F.3d at 194-95.  The Circuit therefore reversed the district court's grant of summary judgment, finding that "there were triable issues of fact as to the time when plaintiffs reasonably should have known the cause of the injuries." *Id.* at 195.  Certainly, then, defendants cannot prevail on this issue at this early juncture.[8]  Indeed, the question is, at this stage, not even close.

---

[8] Of course, plaintiffs' view that the statute of limitations should accrue when a plaintiff is first shown a document by his or her attorney could raise concerns.  This construction seems to put control of the accrual of the statute of limitations entirely within the volitional control of plaintiffs and their counsel and raises the specter of defendants having to respond to cases many years, if not decades, after information about toxicity becomes available.  But those concerns are not present here.  In this case, plaintiffs filed suit with sound (and perhaps commendable) dispatch within a modest time frame after the state of scientific knowledge advanced to reveal that the charged substance could have been the cause of plaintiffs' maladies.  This seems particularly true given the time frame here: according to the allegations, plaintiffs were allegedly exposed to then-unknown toxins over a period of decades, and yet filed litigation within months of the filing deadline which defendants would have the Court adopt.  Furthermore, as noted, the allegations of the Amended Complaint—again, assumed to be true—set forth that at least certain defendants knew that a TCE ban was forthcoming and, rather than warn the plaintiffs or cease its use, secretly stockpiled the chemical. *See* Verified Amended Complaint at ¶ 119, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF No. 1-2.  Under such circumstances, imposing the kinds of obligations upon plaintiffs asserted by defendants seems highly inequitable.

Thus, defendants' motions to dismiss based on statute of limitations issues are DENIED.

### Conversion to Summary Judgment and Restriction of Discovery

This determination informs a decision regarding an alternative application by defendants that, in the event of a denial of the 12(b) motions by this Court, defendants seek conversion of such motions to ones for summary judgment, with the added caveat that discovery should be "limited [to] the date on which [plaintiffs] discovered, or should have discovered, the cause of [their] injuries." *See, e.g.*, Motion to Dismiss at 20-22, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 36 (arguing, *inter alia*, that "Yuhas, ostensibly*,* must have had some knowledge of the purported connection between TCE and his alleged injuries prior to be [*sic*] shown this information by his own attorneys."). Defendants properly recognize that the questions of scheduling and so limiting discovery rests in the sound discretion of this Court. *Id.* (citing, *inter alia*, *H. L. Moore Drug Exch., Inc. v. Smith, Kline & French Labs.*, 384 F.2d 97 (2d Cir. 1967)).

The Court is quite familiar with the obligations of Rule 1 of the Federal Rules of Civil Procedure, which "commands this Court *and* the parties to utilize the Rules to 'secure the just, speedy and inexpensive determination of every action and proceeding.'" *Flores v. Town of Islip*, No. 18-CV-3549 (GRB)(ST), 2020 WL 5211052, at *3 (E.D.N.Y. Sept. 1, 2020) (emphasis in original). Certainly, "targeted discovery" can prove an effective means of satisfying this mandate. *See, e.g.*, *Bravo v. Finest Maint. Inc.*, No. CV 13-342 SJF GRB, 2015 WL 5093599, at *1 (E.D.N.Y. June 15, 2015), *report and recommendation adopted*, No. 13-CV-342 SJF GRB, 2015 WL 5093278 (E.D.N.Y. Aug. 27, 2015).

But here, several factors weigh against this approach.  Significantly, the serious harms and actions alleged here, which have caused debilitating and potentially life-threatening injury to plaintiffs, warrant serious and rapid consideration.  The interests of the parties, as well as the public interest, would be served by a speedy and just determination of these claims.  Defendants have already delayed these proceedings with the instant motion practice, predicated, in some instances, on marginal arguments, for the better part of a year, while simultaneously increasing the costs of this litigation.  Moreover, as this Court finds defendants' statute of limitations argument largely unpersuasive, targeted discovery seems unlikely to provide the silver bullet sought by defendants.

As such, the application to convert the motion to summary judgment while restricting discovery to factual issues relating to the knowledge of plaintiffs as to causation is DENIED.

## II.     Defenses under EEOICPA

The employer-defendants seek dismissal pursuant to the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"), 42 U.S.C. § 7384 *et seq*—commonly referred to by its unpronounceable acronym EEOICPA[9]—asserting that, as employers covered by the congressional compensation scheme set forth in this statute, they have a complete defense to the claims which should therefore be dismissed.  The parties expend great energy on characterizing this defense, to wit: whether it constitutes sovereign immunity, qualified immunity or an exclusive remedy that prohibits the instant suit.  The dispute proves more theoretical than actual, and ultimately, EEOICPA provides a potentially formidable defense for the employer-defendants.  However, the facts alleged—again taken as true for the purposes of this motion—provide

---

[9] During argument, counsel advised the Court that "EEOICPA" is articulated by practitioners with a counterintuitive pronunciation.  Suffice it to say that, unlike radar, scuba and their ilk, this unmellifluous acronym seems unlikely to freely enter the lexicon any time soon.

arguments to plaintiffs that could undercut the defense in whole or in part, such that the motion on this ground is denied without prejudice to renewal after the development of a factual record.

As one court has observed:

The EEOICPA establishes a compensation program that provides benefits to certain employees who suffer from illnesses related to their exposure [to dangerous substances] in connection with the performance of their work for the Department of Energy ("DOE"). *See* 42 U.S.C. §§ 7384(a)(8), 7384d(b). The EEOICPA was intended "to provide for timely, uniform, and adequate compensation of covered employees and, where applicable, survivors of such employees, suffering from illnesses incurred by such employees in the performance of duty for the Department of Energy and certain of its contractors and subcontractors." 42 U.S.C. § 7384d. The DOL is designated as the administrating agency of the program. *See* Exec. Order No. 13,179; 65 Fed.Reg. 77487 (Dec. 7, 2000). Covered employees under Part B of the EEOICPA include those with specified types of cancer who contracted their illnesses after beginning employment at a DOE facility. *See* 42 U.S.C. § 7384l(9) & (17). A covered employee receives compensation in the amount of a $150,000.00 lump-sum payment, plus medical benefits. 42 U.S.C. § 7384s(a)-(b). Part E of the EEOICPA provides additional compensation to certain DOE contractor employees or their eligible survivors for permanent impairment and/or wage loss due to a covered illness resulting from work-related exposure to a toxic substance at a DOE facility. 42 U.S.C. § 7385s.

*Hammond v. United States*, 2014 WL 1277892, at *3-4 (D.S.C. Mar. 27, 2014).   Several plaintiffs—such as plaintiff Marino—have received benefits under EEOICPA, and therefore do not, as they cannot, argue that they are not "covered employees" under the Act.  *See, e.g.*, *See* Reply to Response to Motion at 12, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed May 22, 2020), ECF No. 49.   And there is little question that EEOICPA is intended, as the employer-defendants argue, as an exclusive remedy.  Section 7385c of Title 42, United States Code provides, in relevant part, as follows:

The liability of the United States or an instrumentality of the United States under this subchapter with respect to a cancer . . . of a covered employee is exclusive and instead of all other liability [of] a contractor that contracted with the Department of Energy to provide management and operation, management and integration, or environmental remediation of a Department of Energy facility (in its capacity as a contractor) [or] a subcontractor that provided services, including construction, at a

> Department of Energy facility (in its capacity as a subcontractor) . . . to the covered employee [and] the covered employee's legal representative, spouse, dependents, survivors, and next of kin . . . in any proceeding or action including a direct judicial proceeding, a civil action, a proceeding in admiralty, or a proceeding under a tort liability statute or the common law.

42 U.S.C. § 7385c(a). Counsel for all plaintiffs contend, however, that because the employer-defendants acted in contravention of government directives and, at least arguably, in violation of law, they acted outside their capacity as contractors or subcontractors, and effectively forfeited the protections of the statute.   It is a novel argument based almost exclusively on the statutory language.  *See, e.g.*, Response in Opposition at 11-15, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 31.   Plaintiffs draw some support—albeit by way of analogy—from the Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, , which held that "[w]hen a contractor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).

This principle, plaintiffs argue, bars the defendants from reaping the benefit of the exclusivity bar created by EEOICPA.  This contention is predicated upon the allegations of the complaint, including claims that AUI stockpiled TCE as an end-run around an anticipated DOE ban of its use at its facilities, and that AUI and BSA created a practice of drawing on that stockpile in derogation of that ban and their express contractual responsibilities.  In this regard, though, the statutory exclusivity provision seems to present, at least potentially, different considerations than the "derivative immunity" grant reviewed in *Campbell-Ewald.*  Many workplace accidents arise from negligence deriving from hazards that amount to regulatory or statutory violations, yet remain within the (exclusionary) ambit of workers' compensation.  *See, e.g.*, *Estate of Loveria ex rel. Loveria v. Portadam, Inc.*, 850 F. Supp. 2d 354, 362 (N.D.N.Y. 2010).   However, numerous

17

reported decisions exclude intentional torts from this bar, predicated upon workers' compensation statutes that contain explicit carve-outs for such cases. *See, e.g.*, *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) ("Workers' compensation exclusivity does not, however, preclude an employee's suit if the employer committed an intentional tort or another person committed such an intentional wrong at the employer's direction.").

While there is scant caselaw interpreting EEIOCPA's exclusivity provision, at least one court has ruled that EEIOCPA's exclusivity provisions prohibit claims against a DOE contractor that allegedly acted as a manufacturer or distributor of hazardous machinery, and thus arguably acted outside the scope of its role as a maintenance contractor. *See Lemanski v. Regents of Univ. of Cal.*, 2008 WL 2080773, at *3 (N.D. Cal. May 14, 2008) ("While the FAC does include[] an allegation that [defendants] manufactured or distributed defective instruments . . . which caused injury to Mr. Lemanski while he was working at the LANL . . . if those instruments were at the LANL in conjunction with Johnson's providing services as a contractor or subcontractor, the exclusivity provision applies."). Yet the facts and issues in *Lemanski* differ greatly from those at issue here.

Plaintiffs' arguments turn on Congress's inclusion of the qualifier "in its capacity as a contractor [or] subcontractor" in the text of the exclusivity provision. Does this qualifier indicate that an entity acting outside that capacity disentitles an entity from invoking the bar? The parties acknowledge, and the Court's research confirms, that this question appears to be one of first impression in the Second Circuit. "When construing a statute, [a] fundamental principle of statutory construction [is] that we begin with the language of the statute itself." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 388 (2013) (Sotomayor, J., dissenting). Applying the capacity language raises the question: is it possible that actions by the employer-defendants that are illegal

or egregiously contrary to Government directives may be found to fall outside their "capacity as a contractor [or] subcontractor"?  In other words, could a finder of fact determine that the alleged actions were outside the role of the employer-defendants as a contractor or subcontractor?  In answering these questions, the Supreme Court's decision in *Campbell-Ewald Co. v. Gomez* does become instructive: "when a contractor violates both federal law and the Government's explicit instructions," it is conceivable that that entity could forfeit the benefit of the EEIOCPA exclusivity provision.

The Longshore and Harbor Workers' Compensation Act ("LHWCA"), found at 33 U.S.C. §§ 901 *et seq.*, constitutes one of the few federal statutes comparable to state workers' compensation schemes.  Defendants invite comparison to the instant case, correctly noting that the Second Circuit has held that "[l]ike most state workers' compensation schemes, the LHWCA provides that the statutory, no-fault compensation payments are the employer's exclusive liability to its employees when they are injured in the course of their employment." Reply to Response to Motion at 15, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed May 22, 2020), ECF No. 49 (quoting *Gravatt v. City of New York*, 226 F.3d 108, 115 (2d Cir. 2000)). Yet, the analogy to the LHWCA proves double-edged: based upon the statutory language, applicability of the LHWCA's exclusivity provision turns upon the capacity in which the defendant has acted.  *See Gravatt*, 226 F.3d at 111 ("The statute implies, and has been interpreted to provide, that an employer that is also a vessel owner can be liable to its employees as if it were a third party for negligence in its vessel capacity.").  And the determination of a defendant's capacity—and its ability to invoke the protection of the exclusivity provision—is a fact-based determination as to the nature and context of its actions.  *Id.*  ("We must decide whether S & B's conduct renders it liable to Gravatt in tort given that it acted in this dual capacity of employer and vessel owner.").

Therefore, in *Gravatt*, the Court of Appeals reversed the district court's finding of tort liability by the employer-defendant, but only based upon a full factual record that followed a bench trial. *See id.* at 111-13.  While the LHWCA is helpful only by analogy, it is notable that Congress has enacted a similar compensation scheme in which the application of the exclusivity provision turns on a factual determination of the capacity in which a given defendant acted.

I find that, under the plain language of the statute,[10] actions of an entity that are unlawful, and contrary to contractual obligations and/or government directives may, in extraordinary cases, be actionable if such acts fall outside the "capacity of a contractor or subcontractor" as defined by the exclusivity provision of EEIOCPA.

There is a risk that too much can be read into this language, as not every negligent act, or hazardous risk created by a contractor, can be construed as being outside a contractor's "capacity," even when seen as being inconsistent with Government directives, contrary to contractual provisions or violative of safety regulations.  The statute is clearly meant to create an efficient compensation scheme for employees, on a no-fault basis, avoiding the need for expensive, time-consuming litigation.  Because EEIOCPA deals with serious harms arising from the handling of radioactive and highly toxic materials, the nature of the conduct that would justify a finding that a party acted outside its capacity as a contractor or subcontractor under EEIOCPA would have to be extraordinary.  The parties have not cited any caselaw setting forth a test or standard for making such a determination, and the Court's independent research has revealed none.  Given the

---

[10] Even assuming, *arguendo*, that the statute was ambiguous on this point, rules of statutory construction would compel the same result.  The defendants would have the Court treat the "capacity" qualifier—twice inserted by Congress into the provision—as mere surplusage, running afoul of a basic tenet of statutory construction.  *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 152 (2d Cir.), *amended sub nom. Chen v. U.S. Dep't of Justice*, (2d Cir. Mar. 20, 2006), *and on reh'g*, 471 F.3d 315 (2d Cir. 2006) ("[A]s a matter of statutory construction, we do not assume Congress intended to include pure "surplusage" in its enactments . . . .").  Defendants offer no competing interpretation of the statute that would treat the capacity element as anything other than surplusage.

congressional purpose behind the statute, to wit: to create a comprehensive compensation scheme, the standard would have to be very high.

In crafting such a standard, cases interpreting the "intentional tort" exceptions to state workers' compensation schemes prove instructive.  In *Crippen v. Cent. Jersey Concrete Pipe Co.*, 823 A.2d 789, 791 (N.J. 2003), the court considered the question of whether a fatal industrial accident fell outside the exclusivity provision of Worker's Compensation "due to defendant's deliberate failure to correct OSHA violations and its fraudulent misrepresentations to OSHA that it had abated the unsafe work conditions."  The *Crippen* court reversed a lower court's grant of summary judgment to defendant, finding that "a jury reasonably could conclude that defendant had knowledge that its deliberate failure to cure the OSHA violations would result in a substantial certainty of injury or death to one of its employees."  *Id.* at 797.  In reaching this decision, the court concluded:

> Defendant, contrary to OSHA's order, maintained the safety hazards that ultimately caused Crippen's death, and deliberately deceived OSHA into believing that the violations had been corrected. Defendant effectively precluded OSHA from carrying out its mandate to protect the life and health of defendant's workers. We are persuaded that the Legislature never intended such conduct to constitute a part of everyday industrial life and would not expect it to fall within the Workers' Compensation bar.

*Id.* (alterations omitted).  This remains a high bar.  As one judge noted in a concurring opinion:

> This is a close case.  I join the Court's opinion largely based on plaintiff's allegation that the defendant employer attempted to deceive federal regulators into believing that it had abated certain safety violations prior to the date of Harold Crippen's work-related death. . . . To vault the exclusivity bar, an injured worker must satisfy two conditions . . . . First, he or she must allege sufficient facts demonstrating that an employer knew that its actions were "substantially certain to result in injury or death to the employee."  Second, the worker must show that the circumstances surrounding the injury constituted "more than a fact of life of industrial employment" and that they were plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

21

*Id.* at 798 (Verniero, J., concurring) (citations omitted).  One federal court interpreting the same legislative exception granted summary judgment in a wrongful death action, notwithstanding the existence of an OSHA violation, because "the evidence does not support a conclusion that the circumstances surrounding the death of decent [*sic*] were outside of the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar."  *Estate of Loveria ex rel. Loveria v. Portadam, Inc.*, 850 F. Supp. 2d 354, 362 (N.D.N.Y. 2010).  *Loveria* specifically required a showing of "bad faith" on the part of the employer, noting:

> Plaintiff does not provide evidence that Portadam purposefully ignored mandates from OSHA to change its behavior or that Portadam deceived OSHA in any way. The bad faith involved in the cases in which the second prong was met are simply not present in this case.

*Id.*

In most jurisdictions, to overcome a workers' compensation exclusivity provision, the standard is even higher: "a plaintiff must be able to point to specific facts and evidence that the defendant intended to cause harm." *Lauria v. Donahue*, 438 F. Supp. 2d 131, 141 (E.D.N.Y. 2006) ("[M]ere allegations in a complaint that a defendant acted in a 'willful', 'deliberate', or 'intentional' manner in causing harm, will not be enough to uphold an intentional tort claim."). "The overwhelming weight of authority is that the common law liability of the employer cannot be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct short of genuine intentional injury." *Houston v. Bechtel Assocs. Prof'l Corp., D.C.*, 522 F. Supp. 1094, 1096 (D.D.C. 1981).  Other courts have limited the exclusion to circumstances in which the employer had "reason to believe an injury was 'certain to occur.'"  *Birkenbach v. Nat'l Gypsum Co.*, No. 13-14607, 2014 WL 2931795, at *7 (E.D. Mich. June 30, 2014).  These analogous cases demonstrate that it is the rare case in which plaintiffs may prevail.

In this case, determining the application of the exclusivity provision of EEIOCPA is a fact-intensive question, and at this juncture, the allegations must be assumed as true and all inferences drawn in favor of the plaintiffs as non-movants.  On the facts alleged, whether AUI and BSA may have acted outside their capacities as contractor is a very close question.  Yet it is alleged that AUI preemptively stockpiled massive quantities of TCE specifically in anticipation of a Department of Energy ban of the chemical because of its toxicity.  Further, AUI and BSA allegedly continued to have their employees and those of their subcontractors draw on this stockpile and deploy the substance for sixteen years in violation of that ban, in derogation of Government directives and contractual provisions, and failed to provide such employees with information, equipment and procedures that would have protected them from the allegedly established dangers of TCE.  Taken together, those extraordinary facts, if proven, might satisfy a finder of fact that the employer-defendants acted outside their capacity as a Government contractor or subcontractor.  Thus, at this early juncture, I find that plaintiffs have alleged facts sufficient to cast doubt on whether the employer-defendants acted within the scope of their contractual capacities.  Accordingly, the motion will be denied without prejudice to renewal following the completion of discovery on this issue.[11]

Another complication concerns the time periods in which certain plaintiffs worked for the employer-defendants, and whether the employer-defendants were, in fact, contractors or subcontractors as defined by the statute during those periods.  For example, plaintiff Yuhas allegedly worked for many years at AUI, but after 1998, he became an employee of BSA (seemingly before BSA became the operating contractor at BNL).  Verified Amended Complaint at ¶¶ 160-61, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed September 26, 2019), ECF

---

[11] Nothing in this opinion should be construed as limiting or prioritizing any discovery issues.

No. 1-2.  Other plaintiffs, such as Marino, worked for subcontractors other than the employer-defendants, and the nature of the subcontracting relationship is not clearly articulated.  Exactly how the exclusivity provision applies to each plaintiff and defendant—in other words, whether the plaintiffs are "covered employees" during relevant timeframes—may turn on these distinctions: further factual development will therefore be required before this issue can be fully resolved.

Thus, motions to dismiss by the employer-defendants predicated upon EEIOCPA are denied without prejudice to renewal at the completion of discovery.  *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2011 WL 4575696, at *6 (E.D. La. Sept. 30, 2011), *as amended* (Oct. 4, 2011) ("Because this decision is not based on the merits of Defendants' arguments, however, Defendants are not prejudiced from reasserting this defense at a later time.").[12]

### III.    Miscellaneous Pleading Defects

Defendants move to dismiss the remaining claims, contending that such claims are inadequately pled.  These contentions are dealt with in turn:

#### a.   Abnormally Dangerous Activities

Concerning claims for abnormally dangerous or ultrahazardous activities, one court has observed:

> New York has adopted the six factors enumerated in the Restatement of Torts 2nd (§ 520) to determine whether or not an activity is abnormally dangerous or ultra-hazardous, thus giving rise to strict liability. *Doundoulakis v. Town of Hempstead*, 42 NY.2d 440, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1997). These factors are as follows:

---

[12] For many of the same reasons, to the extent defendants' motions are predicated on the New York Workers' Compensation statute (which excludes claims for negligence and gross negligence) they are denied, though plaintiffs should recognize that the exacting standards applied under New York law will be diligently applied to their claims.

> 1. Existence of a high degree of risk of some harm to the person, land or chattels of others;
> 2. Likelihood that the harm that results from it will be great;
> 3. Inability to eliminate the risk by the exercise of reasonable care;
> 4. Extent to which the activity is not a matter of common usage;
> 5. Inappropriateness of the activity to the place where it is carried on;
> 6. Extent to which its value to the community is outweighed by its dangerous attributes.

*German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 570 (S.D.N.Y.), *decision clarified on reargument sub nom. German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385 (S.D.N.Y. 1995). As several courts have held, "[m]ost useful for purposes of analyzing plaintiffs' claim is whether the risk from the activity is able to be eliminated by the exercise of reasonable care." *Id.* In this case, "[i]mplicit in plaintiff's allegation is the acknowledgment that had defendants exercised due care," the risks from TCE exposure could have been mitigated or abated. *Nat'l R.R. Passenger Corp. v. New York City Hous. Auth.*, 819 F. Supp. 1271, 1279 (S.D.N.Y. 1993). Thus, the third element of the test remains unsatisfied. Moreover, as defendants correctly point out, the value of the work of BNL can hardly be overestimated, casting some doubt as to whether the sixth element has been met. Thus, plaintiffs' claims for ultrahazardous activities are dismissed without prejudice.

### b. Gross Negligence

Defendants also move to dismiss the claims of gross negligence as against the employer-defendants. As the Second Circuit has held:

> On a motion to dismiss, a claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *M+J Savitt, Inc. v. Savitt,* No. 08 Civ. 8535(DLC), 2009 WL 691278, at *12 (S.D.N.Y. Mar. 17, 2009) (*quoting AT & T v. City of New York,* 83 F.3d 549, 556 (2d Cir.1996)). Recklessness in the context of a gross negligence claim means "an extreme departure from the standards of ordinary care," such that "the danger was

either known to the defendant or so obvious that the defendant must have been aware of it." *AMW Materials Testing, Inc. v. Town of Babylon,* 584 F.3d 436, 454 (2d Cir.2009) (internal quotation mark omitted).

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61-62 (2d Cir. 2012).  Defendants halfheartedly argue that plaintiffs' "conclusory allegations state no more than a claim for ordinary negligence."   Motion to Dismiss at 21, *Marino v. Brookhaven Science Associates, L.L.C. et al*, No. 19-CV-4839 (filed May 22, 2020), ECF No. 46.   As discussed above, the specific allegations—which could be described as shocking—go far beyond ordinary negligence.  In fact, the allegations "smack[] of intentional wrongdoing" and "may plausibly be said to have been an extreme departure from the standard of ordinary care," elements that the Second Circuit identified as adequate to satisfy the pleading requisites for gross negligence. *Bayerische Landesbank*, 692 F.3d at 62.  Therefore, the motion to dismiss the claims for gross negligence are denied.

### c.  Fraudulent Concealment

Turning to plaintiffs' claims for fraudulent concealment, plaintiffs' pleadings must be reviewed through the more exacting lens of Rule 9(b). *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed.R.Civ.P. 9(b).").   As plaintiffs acknowledge:

> Under New York law, to sustain a fraudulent inducement claim the Plaintiff must plausibly allege that "(1) the defendant made a material, false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation and (4) the plaintiff suffered damage as a result of such reliance" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir.2006) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir.1996)). A fraudulent concealment claim shares these same elements with

> the additional requirement that a plaintiff must show that the defendant had a duty
> to disclose the material information.

*Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 119 (E.D.N.Y. 2011); Response in Opposition at 30, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 31.  Here, the pleadings are silent as to an intent to defraud, a defect that proves fatal to this claim.  *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 545 (S.D.N.Y. 2016) ("[The] fraudulent concealment claim is dismissed because the FAC fails to allege a strong inference of fraudulent intent as required under Rule 9(b) . . . .").  In fact, plaintiffs correctly argue that, based upon the allegations, defendants undertook the actions described "with no apparent reason." Response in Opposition at 28, *Yuhas v. Associated U., Inc. et al*, No. 19-CV-5475 (filed May 22, 2020), ECF No. 31.  Thus, the motion to dismiss the fraudulent concealment claim is granted without prejudice to repleading, though effective repleading may not be possible.

**CONCLUSION**

For the foregoing reasons,  it is hereby ORDERED that defendants' motions to dismiss the complaints in these cases are hereby GRANTED IN PART and DENIED IN PART, as follows:

1. The motions by all defendants predicated upon statute of limitations are denied;

2. The motions by the employer-defendants based upon the exclusivity provisions of EEIOCPA are denied without prejudice to the reassertion of these defenses after discovery;

3. Plaintiffs' claims of abnormally dangerous or ultrahazardous activities are dismissed without prejudice;

4. Defendants' motion to dismiss claims of gross negligence are denied; and

5. Plaintiffs' claims sounding in fraudulent concealment are dismissed without prejudice.

It is further ordered that counsel are directed to meet and confer forthwith to (a) develop procedures to ensure the effective consolidation and coordination of these cases and related cases in a manner designed to reduce costs, save time and conserve judicial resources and (b) prepare a comprehensive discovery schedule which will be submitted to the assigned magistrate judge within forty-five (45) days of the date of this decision.  The matter is referred to the assigned magistrate judge for all non-dispositive determinations to help ensure fair and efficient preparation and resolution of these cases.

Dated: Central Islip, New York
         December 21, 2020

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge

28